de Blasio v New York City Conflict of Interest Bd. (2025 NY Slip Op 25008)

[*1]

de Blasio v New York City Conflict of Interest Bd.

2025 NY Slip Op 25008

Decided on January 13, 2025

Supreme Court, New York County

Ally, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on January 13, 2025
Supreme Court, New York County

Bill de Blasio, Petitioner,

against
New York City Conflict of Interest Board and the City of New York, Respondents.

Index No. 155404/2023

Petitioner Bill de Blasio
Andrew G. Celli, Esq. (acelli@ecbawm.com)
Daniel M. Eisenberg, Esq. (deisenberg@ecbawm.com
Sana Mayat, Esq. (smayat@ecbawm.com)
Emery Cilli Brinckerhoff Abady Ward & Maazel LLP
600 5th Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
Laurence D. Laufer, Esq. (ldlaufer@ldlauferlaw.com)
Laurence D. Laufer, Attorney at Law
49 Mt. Pleasant Road
Mt. Tremper, NY 12457
(212) 867-2781
Respondents New York City Conflict of Interest Board and The City of New York
Nicole L. Gueron, Esq. (ngueron@cgr-law.com)
Emily S. Reisbaum, Esq. (ereisbaum@cgr-law.com)
David C. Kimball-Stanley, Esq. (dkimbalstanley@cgr-law.com)
Clarick Gueron Reisbaum LLP
220 5th Avenue, 14th Floor
New York, NY 10001
(212) 633-4310

Shahabuddeen A. Ally, J.

The following e-filed documents, listed by NYSCEF document number, were read on this [*2]motion (Seq. No. 2) to DISMISS: 1, 15—46, 48
Petitioner BILL DE BLASIO ("Petitioner") was Mayor of New York City from 2014 to 2021. In May 2019, Petitioner announced that was he running for President of the United States. Four months later, in September 2019, Petitioner suspended his campaign. During his campaign, Petitioner or members of his immediate family took 31 out-of-state trips on which they were assigned and accompanied by a full-time security detail of officers of the New York City Police Department (the "NYPD").
Shortly before announcing his candidacy, Petitioner consulted respondent NEW YORK CITY CONFLICT OF INTEREST BOARD (the "Board") on whether respondent THE CITY OF NEW YORK (the "City"; and, together with the Board, "Respondents") could pay all costs associated with providing Petitioner and his immediate family an NYPD security detail during political trips. By written confidential advisory opinion dated May 15, 2019 (the "2019 AO"), the Board opined that while the City could indeed pay the officers' salaries and overtime, it could not pay the officers' out-of-City travel-related costs. Payment of those costs by the City, the Board advised, would violate the City's conflict-of-interest laws, specifically, § 2604(b)(2) and (3) of the New York City Charter (the "Charter") and § 1-13(b) of Title 53 of the New York City Rules and Regulations (the "Board Rules"), because it would constitute a prohibited use of City resources for a non-City purpose as well as Petitioner's use of his official position for his own financial gain or personal advantage.
Contemporaneously with the end of Petitioner's campaign, the Board requested that the New York City Department of Investigation (the "DOI") investigate whether the City had been paying for Petitioner's security detail's campaign-related travel costs. The DOI's investigation of the matter, which was consolidated with investigations of separate questions involving the propriety of the use of NYPD security details by members of Petitioner's immediate family and lasted for approximately two years, involved review of documents provided by the NYPD and Petitioner's campaign, as well as interviews with more than a dozen individuals, including Petitioner and his wife and the members of their security detail. In its report, issued in October 2021, the DOI found that the NYPD had incurred $319,794.20 in unreimbursed out-of-City travel-related costs for the security detail, including the officers' airfare, hotel accommodations, and meals, during Petitioner's campaign.
In August 2022, the Board commenced an enforcement action against Petitioner before the New York City Office of Administrative Trials and Hearings ("OATH"), charging Petitioner with violating Charter § 2604(b)(2) and Board Rules § 1-13(b). In a Report and Recommendation dated May 4, 2023 (the "OATH R&R"), issued after an evidentiary hearing held virtually on December 20, 2022, OATH upheld the charges and recommended that Petitioner be required to fully reimburse the City for the NYPD's travel-related costs and pay a fine of $155,000. The Board fully adopted OATH's recommendations in a Final Findings of Fact, Conclusions of Law, and Order dated June 15, 2023 (the "COIB Order").
On the same day of the COIB Order, Petitioner commenced this special proceeding by filing a Verified Petition and Notice of Petition. In the Verified Petition, Petitioner alleges two causes of action: (1) the first, pursuant to 42 U.S.C. § 1983, alleges violations of Petitioner's First and Fourteenth Amendment rights; and (2) the second, pursuant to CPLR Article 78, alleges that the 2019 AO, the OATH R&R, and the COIB Order are arbitrary and capricious. As relief, Petitioner seeks: (1) a declaration that the City will pay all of Petitioner's NYPD security detail's expenses; (2) an order vacating the 2019 AO, the OATH R&R, and the COIB Order; (3) a judgment in favor of Petitioner and against Respondents pursuant to Article 78; and (4) an [*3]award of attorneys' fees, costs, and disbursements.
On November 17, 2023, Respondents moved to dismiss the Verified Petition pursuant to CPLR § 7804(f) and Rule 3211(a)(7). Petitioner filed opposition to the motion on December 15, 2023, and Respondents filed a reply on January 19, 2024. The Court heard oral argument on the motion virtually on April 30, 2024.
The Court now grants the motion. For the reasons that follow, the Court determines that Respondents have demonstrated that Petitioner's claims that Respondents acted arbitrarily and capriciously and in violation of law are meritless. The Court further determines, for the reasons that follow, that Petitioner's constitutional claims are unpreserved for review and, in any event, meritless. Accordingly, Respondents' motion to dismiss is granted, and the Verified Petition is dismissed.
I. Background
A. The Board's Creation, Purpose, and Powers
The Board was created as part of the December 1986-to-November 1988 New York City Charter Revision (the "1988 Charter Revision"). (See Aff. of Emily Reisbaum in Supp. of Mot. to Dismiss, dated Nov. 17, 2023 ("Reisbaum Aff.") (NYSCEF Doc. 30), Ex. A ("Charter Revision Report") (NYSCEF Doc. 31) at 148, 154-56) In adopting the proposals of the 1988 Charter Revision, City voters replaced the Board's predecessor agency, the Board of Ethics, with a new, strengthened agency tasked with overseeing compliance with the City's conflict-of-interest laws, codified in Chapter 68 of the Charter. (Id.) Rosenblum v. N.Y.C. Conflicts of Interest Bd., 18 NY3d 422, 425 (2012).
Under Chapter 68, the Board is expressly empowered and directed to, among other things:
(1) issue rules interpreting and implementing the provisions of Chapter 68, Charter § 2603(a);
(2) issue advisory opinions on the application of Chapter 68 and the Board Rules to specific contemplated actions, id. § 2603(c);
(3) direct the DOI to investigate any matter over which the Board has jurisdiction, id. § 2603(f); and
(4) conduct hearings to enforce the provisions of Chapter 68 and the Board Rules, id. § 2603(h).
(Charter Revision Report at 156-61, 163-67) Chapter 68's prohibitions and the Board's jurisdiction for its rules and enforcement actions extend to all "public servants," defined as "all officials, officers and employees of the city," Charter § 2601(19), including "former public servants," id. § 2603(c)(5), (e)(3), (g)(3), (h)(7). (Charter Revision Report at 153)
As relevant to this dispute, Charter § 2604(b)(2) was among the provisions adopted as part of the 1988 Charter Revision. That section provides that "[n]o public servant shall engage in any business, transaction or private employment, or have any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties." Charter § 2604(b)(2). According to the Charter Revision Report, this provision is a "'catchall' prohibition" that was retained "in recognition of the fact that the specific prohibitions set forth in the chapter cannot address all conflict of interest situations which may arise in the future and that the board must retain the flexibility to handle new situations as they arise." (Charter Revision Report at 175) Pursuant to its rulemaking authority under Chapter 68, the Board adopted Board Rules § 1-13(b) interpreting and implementing Charter § 2604(b)(2). Section 1-13(b) provides that "it shall be a violation of City Charter § 2604(b)(2) for any public servant to use City [*4]letterhead, title, personnel, equipment, resources, supplies, or technology assets for any non-City purpose." 53 R.C.NY § 1-13(b).
Under the 1988 Charter Revision, the Board also retained its authority and obligation to issue advisory opinions. See Charter § 2603(c). (Charter Revision Report at 158) Those opinions, however, may now be issued only at the request of a public servant or supervisory official,[FN1]
whereas, under the previous charter, advisory opinions could be issue by the Board of Ethics on its own initiative. (Charter Revision Report at 160) "Advisory opinions are to be used to provide advice and guidance to public servants who are uncertain of the application of the conflict of interest standards to specific contemplated actions." (Id. at 159) In other words, advisory opinions may be sought concerning only future conduct, not past or ongoing conduct. See Charter § 2603(c)(2). (Charter Revision Report at 159)
"[A]dvisory opinions have a binding effect on future conduct," so that "a public servant cannot be penalized for any action taken in accordance with an advisory opinion." (Charter Revision Report at 160) Charter § 2603(c)(2). A significant limitation on that principle, however, is that advisory opinions apply only to the individuals who sought them and only to the specific facts considered by the Board in rendering them. Charter § 2603(c)(1). (Charter Revision Report at 160-61 ("Advisory opinions apply only to the individual in question and to the set of facts considered.")) Thus, no public servant other than the one who requested the opinion may rely on it as anything but nonbinding guidance, although others may still cite advisory opinions in enforcement actions and the Board may still consider them in reaching its decisions. (Charter Revision Report at 160-61)
Because an advisory opinion is individual- and fact-specific, "if the [B]oard determines that an opinion reflects a general principal which may be applied more broadly to other public servants, it should embody the content of the opinion in a rule." (Id. at 161) To that end, Charter § 2603(c)(4) provides that each year the Board shall publicly identify in its annual report any advisory opinions issued during the prior year that "establish[] a test, standard or criterion" or "will be the subject of future advisory opinion requests from multiple persons" and "shall initiate a rulemaking to adopt any such opinion, or part of an opinion, so determined."
The 1988 Charter Revision further empowered the Board, for the first time, to adjudicate disputes, where previously "violations of the code of ethics [were] enforced, if at all, as part of disciplinary actions at the agency level or by criminal prosecution." (Charter Revision Report at 163) Charter § 2603(h); Rosenblum, 18 NY3d at 432. The Board exercises its adjudicatory power through enforcement actions, which are governed by the procedures set forth in Charter § 2306(h) and Board Rules §§ 2-02 and 2-03.
If, through a complaint, investigation, or other information, the Board makes an initial determination that there is probable cause to believe that a public servant violated Chapter 68, the Board must first notify that individual by service of a Notice of Initial Determination of Probable Cause. Charter § 2306(h)(1); 53 R.C.NY § 2-02(a); Rosenblum, 18 NY2d at 426. The public servant may then submit a response. Charter § 2306(h)(1); 53 R.C.NY § 2-02(b); Rosenblum, 18 NY2d at 426. Based on the public servant's response, the Board must determine whether to dismiss the action or sustain its initial probable-cause determination. Charter § 2306(h)(2); 53 R.C.NY § 2-02(b)(3).
If the Board sustains its initial probable-cause determination, it
shall hold or direct a hearing to be held on the record to determine whether such violation has occurred, or shall refer the matter to the appropriate agency if the public servant is subject to the jurisdiction of any state law or collective bargaining agreement which provides for the conduct of disciplinary proceedings, provided that when such a matter is referred to an agency, the agency shall consult with the board before issuing a final decision.
Rosenblum, 18 NY2d at 426 (quoting Charter § 2603(h)(2)). The Board has, by rule, designated OATH to conduct hearings on alleged violations for which the accused public servant is not entitled to alternative disciplinary rights under state law or a collective-bargaining agreement. 53 R.C.NY §§ 2-02(c)(1)-(2), 2-03(a). (See Charter Revision Report at 165 ("Hearings shall be heard by [OATH], unless the [B]oard determines by rule that it should conduct its own adjudications.")) At the hearing before OATH, the Board bears the burden of proof by a preponderance of the evidence. 53 R.C.NY § 2-03(f)(1). After the hearing, OATH must issue a report recommending "findings of fact, conclusions of law and a proposed disposition for the Board's review and final action." Rosenblum, 18 NY2d at 426; 53 R.C.NY § 2-03(g). The parties to the enforcement action have an opportunity to submit comments to the Board "to explain, rebut, or provide information concerning OATH's recommended findings of fact, conclusions of law, and disposition." 53 R.C.NY § 2-03(h).
If, based on OATH's report, documents admitted into evidence during the evidentiary hearing, the transcript of the hearing, and the parties' post-hearing written comments, if any, the Board determines, by a preponderance of the evidence, that a violation of Chapter 68 has occurred, it
shall, after consultation with the head of the agency served or formerly served by the public servant, or in the case of an agency head, with the mayor, issue an order either imposing such penalties provided for by this [Chapter 68] as it deems appropriate, or recommending such penalties to the head of the agency served or formerly served by the public servant, or in the case of an agency head, to the mayor . . . .
Charter § 2603(h)(3); see also 53 R.C.NY § 2-03(i) ("If the Board determines that it has proven by a preponderance of the evidence that the respondent violated a provision of a law identified in 53 RCNY § 2-01(a), the Board will issue an order stating its final findings of fact and conclusions of law and imposing a penalty."). The requirement that the Board consult with the head of the agency at which the public servant is employed, or if the public servant who is the subject of the enforcement action is an agency head, with the mayor, "recognizes that agencies have a strong interest in disciplining of their officers and employees." (Charter Revision Report at 166) "While the [B]oard is not required to adopt the views expressed by the agency, an agency head may raise issues or concerns the [B]oard will wish to consider in rendering a decision concerning the imposition of penalties." (Id.) In any event, if the agency independently decides to take disciplinary action against the public servant, that action does not preclude the Board from exercising its own powers and duties under Chapter 68, or vice versa. Charter § 2603(h)(6). (Charter Revision Report at 166)
For any violation of Charter § 2604, the Board has the authority, under Charter § 2606, to "order payment to the city of the value of any gain or benefit obtained by the respondent as a result of the violation" and, after satisfying the same consultation requirement set forth in Charter § 2603(h)(3), to impose fines of up to $25,000 and recommend the public servant's suspension or removal from office or employment. Charter § 2606(b), (b-1). The Board may not seek or impose a penalty for a violation of § 2604, however, unless "such violation involved [*5]conduct identified by rule of the [B]oard." Id. § 2606(d).
B. The Board's Relevant Prior Advisory Opinions
Two of the Board's advisory opinions pre-dating the 2019 AO and the events underlying this proceeding are central to the parties' dispute, those advisory opinions having been examined closely by the Board in the 2019 AO and relied upon by the parties in constructing and advancing their arguments both here and before OATH. The advisory opinions in question, both of which were issued publicly, are Advisory Opinion No. 2009-1 (Reisbaum Aff., Ex. E ( "2009 AO") (NYSCEF Doc. 35)) and Advisory Opinion No. 2012-5 (id., Ex. B ( "2012 AO") (NYSCEF Doc. 32)). The Court summarizes both below.
i. The 2009 AO
On March 12, 2009, at the request of "certain elected officials," the Board issued the 2009 AO, entitled "Use of City-Owned Vehicles." (2009 AO) As its title suggests, the 2009 AO addresses whether and under which circumstances elected New York City officials who have use of City-owned vehicles [FN2]
may use them and City personnel as drivers for purposes other than official business. The Board analyzed that issue under Charter § 2604(b)(2) and (3)[FN3]
and Board Rules § 1-13, which "specifie[s] certain conduct that constitutes a violation of [§] 2604(b)(2)." (See id. at 1, 3-4)
The Board structured its analysis by dividing the elected officials to which the 2009 AO applies into two categories and addressing each category in turn. The first category—"Category 1"—comprises "Elected Officials for whom the [NYPD] has determined that requirements of personal security dictate, at a minimum, that provision of a City-owned car and security personnel is necessary." (Id. at 2) The second category—"Category 2"—comprises "all other Elected Officials who currently have use of a City-owned car and, in some cases, a City employee as a driver." (Id.) The distinguishing factor between Category 1 and Category 2 is, therefore, whether the NYPD has determined that the official requires personal security. If the NYPD has made such a determination, the elected official will "conclusively" fall within Category 1 for purposes of the Board's analysis. (Id. at 9)
In the 2009 AO, with respect to Category 1 elected officials, the Board determined that "any use of a City-issued car and security personnel by that public servant, whether for official or for personal purposes or for any combination of the two, is consistent with Chapter 68, and no reimbursement to the City for such use is required." (Id. at 10-11 (emphasis in original)) More specifically, the Board determined that Category 1 elected officials could "use City vehicles, drivers, and security personnel when they attend political events, such as campaign fundraisers, and personal non-City business events, provided that the official's participation in such activities [*6]does not otherwise result in a conflict of interest," and that such elected officials "may even use the car and driver to travel outside the City, if consistent with security determinations by the NYPD." (Id. at 9)
The Board's analysis underlying its determination concerning Category 1 elected officials is based on a number of factors. First, the Board recognized that a Category 1 elected official's "need for protection and security remains the same whether the official ventures forth to perform a personal rather than an official task or to attend a private social function rather than a public event." (Id.) Thus, according to the Board, "there can be no effective restriction on these officials' 'personal' use of City cars and drivers." (Id.)
Second, the Board reasoned that its conclusion that Category 1 elected officials can use City vehicles and personnel for political and business events and to travel outside the City "reflects sound public policy, because it will encourage public officials to follow and adhere to security recommendations, and not ignore them in order to avoid violating the ethics law." (Id.) The Board acknowledged that the NYPD strongly advised Category 1 elected officials "to use the security personnel assigned to them, in the manner prescribed by the NYPD, whenever they move about, whether for public or private purposes." (Id.)
Third, the Board reasoned that requiring Category 1 elected officials to reimburse the City for unofficial use of City vehicles would be unfair and present significant issues of practicability, writing:
Since officials in this category are subject to security determinations by the NYPD requiring them to use City vehicles to the maximum extent possible for all local transportation, official or otherwise, it would be unfair to require them to pay for any use deemed unofficial. Moreover, given these officials' constant use of the required vehicles, an effort to determine what use must be reimbursed would require an almost limitless parsing and costing to determine how much of that use is 'official,' or incidental to official business, and how much is in no way related to official business. Any such attempt, particularly if applied to officials who . . . are on call essentially every hour of the day and night, seems both an impossible and an unfair accounting burden on all involved.
(Id. at 10) Nevertheless, the Board opined that elected officials "are free to reimburse the City for non-City use of their City vehicles for example [sic], to reimburse with campaign funds for political use." (Id. at 11)
With respect to Category 2 elected officials, the Board determined that they too may "use their City cars for personal as well as official purposes." (Id. at 12) In reaching that determination, the Board recognized that Category 2 elected officials are "regularly require[d] . . . to appear in their official capacities at functions and events, to respond to emergencies, or to otherwise attend to the needs of their constituents, outside of normal business hours" (id. at 11), so that "[r]equiring these public officials to switch from official vehicles to personal vehicles to pursue official duties, would defy common sense and might impede their ability to respond expeditiously to the needs of their constituents" (id. at 12).
It was based on this rationale—i.e., "promot[ing] the ready presence of these officials at the myriad meetings, functions, events, or emergencies that occupy their official lives" (id.)—that the Board determined, however, that a Category 2 elected official's use of City vehicles is limited in a way that a Category 1 elected official's use is not. According to the Board, a "City car may be used by the Category 2 Elected Official only within the five boroughs or within a sufficiently close geographic range thereof to permit timely return to the City in cases [*7]of emergencies." (Id. (emphasis added))
As to reimbursement for the use of their City vehicles, the Board determined that, like Category 1 elected officials, Category 2 elected officials need not reimburse the City for any permitted use of their City vehicles within the five boroughs. (Id.) The reasoning provided by the Board was again based primarily on practical considerations: "a rule requiring these officials to keep track daily of the breadth and duration of non-City use ultimately would devolve into a complex of such minute detail as to be incomprehensible or unworkable, or both." (Id. at 12-13) However, any Category 2 elected official's use of a City vehicle for travel outside of the City's five boroughs, but within a range permitting timely return to the City, is "presumptively considered personal and will thus require reimbursement to the City," unless the Category 2 elected official can make "a showing that a particular trip outside the City is clearly and exclusively for an official purpose." (Id. at 13, 15-16)
ii. The 2012 AO
On December 19, 2012, after receiving "a number of questions from public servants, including in particular from current City elected officials who anticipate being candidates for elective office in the near future," the Board issued the 2012 AO, entitled "Political Activities: Campaign Related Activities." The 2012 AO addresses whether public servants may, in accordance with the prohibitions of Chapter 68 and the Board Rules, engage in certain political-campaign-related activities. The Board analyzed the propriety of the specific activities at issue under a number of Charter provisions, including Charter § 2604(b)(2), as well as under Board Rules § 1-13(a)[FN4]
and (b). (See 2012 AO at 1-4)
Initially, the Board stated unequivocally that "political activities always fall within the prohibition on use of City time or resources, that is, there is no 'incidental use' exception for political activities." (Id. at 2 (emphasis in original)) In other words, according to the Board, a public servant's use of City time or resources for political activities, regardless of how seemingly minor the use may appear, always violates Board Rules § 1-13(a) or (b). At the same time, the Board expressly acknowledged that the 2009 AO—which, as just discussed, permits certain elected officials to make use of their City-owned vehicles for personal or political purposes without reimbursement—constitutes an "exception to this flat ban" on the use of City time or resources of political purposes. (Id. at 2 n.1)
As relevant to Board Rules § 1-13(a) and (b), the 2012 AO goes on to determine, among other things, that:
(1) City schedulers are prohibited from using City time or resources to arrange campaign events (id. at 5);
(2) City employees who receive telephone calls or email messages concerning an official's election campaign may respond to such inquiries only by providing campaign contact information (id. at 7);
(3) City employees who act as a "body person" or an "advance person" to an elected official may attend campaign events on City time "only if it can reasonably be anticipated that they would be required to perform official City duties at the event and if the only duties they in fact perform at the event are official City duties," and because an "advance person" would have few, if any, City duties to perform at campaign events, "it [*8]would ordinarily violate Chapter 68 for an advance person to attend campaign events on City time" (id. at 8-10 (emphasis in original)); and
(4) photographs of elected officials taken by City employees may only be provided to the official's election campaign if they are also made available to the public, and then only on the same terms and by the same process as to the public (id. at 10-11).
C. Petitioner's NYPD Security Detail
Petitioner was elected Mayor of New York City in 2013 and took office in 2014. (Verified Pet., dated June 15, 2023 ("Pet.") (NYSCEF Doc. 1), ¶ 27). He served in that position until his second term ended on December 31, 2021. (Id. ¶ 74)
Throughout his two terms as Mayor, Petitioner and his immediate family were assigned an NYPD security detail that provided them with protection seven days a week, 24 hours a day, regardless of their location or the activity in which they were engaged, whether official or unofficial in nature. (See id. ¶¶ 41, 44) For example, Petitioner alleges that, in 2014, he and his family traveled to Italy "in part on official City business and in part for a family vacation" and that the NYPD provided Petitioner and his family with a security detail for that trip without the City seeking to recoup any costs. (Id. ¶ 45) Petitioner also alleges more generally that, during his tenure as Mayor, "he . . . travelled outside the City, on overnight trips, for political purposes, including political fundraising, support of other candidates or the Democratic Party, and political meetings." (Id. ¶ 46) According to Petitioner, the "NYPD provided a full-time NYPD protective detail to [Petitioner] on all of those occasions, and all of the expenses for this protective detail were borne by the City." (Id.)
The decision to assign Petitioner and his immediate family a full-time security detail was made solely by the NYPD, based on its assessment of the number, seriousness, and credibility of the threats that Petitioner and his immediate family faced to their safety. (See id. ¶¶ 39, 42-43) Petitioner alleges that "[i]t is the practice of the NYPD to conduct an ongoing threat assessment facing each Mayor and to provide a protective security detail to all designated protectees . . . as it deems necessary based on the threats they face." (Id. ¶ 32) The City provides mayors security details like the one provided to Petitioner allegedly "to protect and advance the City's interests in a functioning City government" and to "create a constant channel for City officials, secure information about City business and operations, and governance during times of crisis." (Id. ¶ 33) The City, Petitioner alleges, "has a compelling interest in securing the safety of its Mayor." (Id. ¶ 34)
During Petitioner's time in office, the "NYPD's Intelligence Bureau Threat Management Unit recorded at least 292 known threats to [Petitioner] that required investigation, and at times, increased security." (Id. ¶ 40) Petitioner alleges that, based on its analysis of the threats that Petitioner and his family faced, the NYPD designated Petitioner—just like it had designated "all previous mayors in recent City history"—a so-called "Category 1" elected official requiring around-the-clock security.[FN5]
(Id. ¶ 41) "At no point did [Petitioner] ever question, interrogate, influence, or overrule the NYPD's security determination or attempt to increase, modify, or reject the protective detail provided by the NYPD;" instead, Petitioner allegedly "deferred to the NYPD's mission and relied upon its professional judgment about the appropriate nature and level of its protective services for him and his family." (Id. ¶ 43)
Petitioner concedes that the NYPD—allegedly consistent with its past [*9]practice—provided Petitioner and his immediate family with a full-time protective detail for 31 out-of-state political events held during his campaign for the office of President of the United States, which he launched on or about May 16, 2019. (See id. ¶¶ 28, 36-38, 50, 67, 69-70) Petitioner alleges that the NYPD provided a protective detail on these trips "[u]nder its authority to use its best law enforcement judgment to protect the City's Mayor" and based on its assessment "that the threats that [Petitioner] faced throughout his term in office were credible, genuine, and immediate." (See id. ¶¶ 50-51) According to Petitioner, "[i]n 2019, NYPD assessed that the threat to [Petitioner] and his family during his presidential campaign was particularly high and credible, exacerbated by inflammatory statements made by then-President Donald J. Trump." (Id. ¶ 47) Specifically, "the NYPD identified threats or risk to [Petitioner] and his family's safety and security by various militia groups, including the Oath Keepers . . . , the Three Percenters . . . , The Base . . . , and QAnon," as well as by a "self-avowed follower of ISIS" who was allegedly considering an attack on Gracie Mansion, Petitioner's official residence, and a "person who later supported the January 6 insurrection" who "had been arrested across the street from Gracie Mansion for possessing an assault weapon, a shotgun, a pistol, and hundreds of rounds of ammunition." (Id. ¶¶ 49, 52) These threats," Petitioner emphasizes, "came against the backdrop of a marked rise in violence directed at elected officials generally during the past decade," citing, among other examples, the January 6 insurrection. (Id. ¶ 53)
D. The 2019 AO
On May 8, 2019, eight days before Petitioner announced his campaign for the presidency, Kapil Longani, Counsel to the Mayor, wrote to the Board seeking an advisory opinion addressing two questions:
• Under the assumption that NYPD has determined that security is required, can the City pay all costs associated with providing NYPD-approved security for the Mayor on a political trip?
• Under the assumption that NYPD has determined that security is required for members of the Mayor's immediate family, can the City pay all costs associated with providing security for the Mayor's immediate family members on a political trip?
(Reisbaum Aff., Ex. C (NYSCEF Doc. 33))
On May 15, 2019, the day before Petitioner announced his campaign, the Board sent Mr. Longani the 2019 AO, in which the Board answered both of Mr. Longani's questions in the negative. (Id., Ex. D ("2019 AO") (NYSCEF Doc. 34); see also Pet. ¶ 63) Specifically, the Board determined that while the officers' salaries and overtime could be paid by the City, any of the officers' ancillary costs associated with campaign trips must be paid by the campaign, writing in conclusion:
Where NYPD has made the determination that security provided by NYPD is necessary to protect the Mayor [or a member of the Mayor's immediate family] when [they] travel outside of the City as part of a campaign in which [the Mayor] is pursuing non-City elected office for himself, the City may pay for the salary and/or overtime of NYPD personnel assigned to provide that security for the Mayor [or a member of the Mayor's immediate family] on such a campaign trip.
However, the City may pay for only the salary and/or overtime of the NYPD personnel on such a campaign trip. All other costs associated with such personal campaign travel—including but not limited to airfare, rental cars, overnight accommodations, meals, and other reasonable incidental expenses—must not be borne by the City. Rather, these costs must be paid or reimbursed by the Mayor's campaign committee.
(2019 AO at 4-5 (emphasis in original); see also Pet. ¶¶ 65-66)
At the outset of the 2019 AO, the Board first acknowledged that Mr. Longani's questions were questions of "first impression for the Board, not clearly covered by any Board Rules or prior advisory opinions," and that the closest the Board had come to addressing the issue on a prior occasion was in the 2009 AO. (Id. at 2) Accordingly, the Board's subsequent analysis of the issue in the 2019 AO is preceded by a discussion of what the Board had and had not consider in the 2009 AO.
As to what the Board had considered in the 2009 AO, the Board wrote that it had "address[ed] the question of the proper use by certain City elected officials of an official City vehicle and accompanying personnel, and of the kind of travel that could be accomplished by using a City vehicle, that is, presumably travel within driving distance of the City." (Id. (emphasis added)) Similarly, according to the Board, "[i]n evaluating the use of a City vehicle and security personnel in connection with political events in [the 2009 AO]," the Board "contemplated events in or near the City." (Id. (emphasis added)) With respect to travel within the City, "when official and political business might be mixed," the Board had, in the 2009 AO, rejected the requirement that "an elected official . . . apportion the use of the City vehicle between City and non-City purposes . . . because it would pose 'an impossible and an unfair accounting burden.'" (Id. (quoting the 2009 AO at 10)) But the Board concluded in the 2019 AO that "[t]here would be no great accounting burden in allocating costs for political trips, unrelated to City business, at a distance from the City." (Id.)
By contrast, the Board wrote that it had not considered in the 2009 AO "the use of City resources in connection with purely political travel at a distance from the City." (Id. (emphasis added)) Nor, according to the Board, did the Board's discussion in the 2009 AO "consider the many different kinds of out-of-town political travel in which an elected City official can engage." (Id. at 3) After providing examples of such differing circumstances, the Board chose to limit its analysis in the 2019 AO to "out-of-City political travel incident to the Mayor's pursuit of non-City elective office for himself." (Id.)
Proceeding to the core of its analysis, the Board next reiterated its recognition of the principle, earlier recognized by the Board in the 2009 AO, that "the Mayor's 'need for protection and security remains the same whether the official ventures forth to perform a personal rather than an official task or to attend a private social function rather than a political event.'" (Id. (quoting the 2009 AO at 9)) The Board further acknowledged that this reasoning "applies to travel to and attendance at purely political events, whether in or at a distance from the City." (Id.) Based on this reasoning, the Board concluded that the City could pay the salary and overtime of the Mayor's and his immediately family's security details during out-of-state political trips. (Id.) These costs, the Board observed, "would generally be the same whether the Mayor is at a political event in Brooklyn or Des Moines." (Id.)
Any ancillary costs of the Mayor's security detail for trips outside of the City, such as airfare, rental cars, hotel accommodations, meals, and other necessary related expenses, were not, however, payable by the City. (Id.) Such costs, the Board reasoned, were "not the same as ancillary security costs for local political activity and thus may require substantial public expenditures to support purely political activity." (Id.) The Board further reasoned that such additional travel-related costs were "necessitated by the fact of long-distance travel to accompany the Mayor on a purely political trip" and "would not ordinarily be incurred in connection with political travel within the City." (Id.) Thus, the Board concluded, the City's payment of "these additional costs for out-of-City travel incurred as part of the Mayor's [*10]campaign for non-City elective office would be" a violation of Charter § 2604(b)(2) and (3). (Id.) The Board noted that such costs, "when incurred in the course of a political campaign, would ordinarily be charged to a political or campaign committee." (Id.)
Neither Petitioner nor Mr. Longani nor any other individual purporting to represent Petitioner sought reconsideration of the 2019 AO prior to any of Petitioner's 31 campaign trips—i.e., prior to taking the actions that were the subject of the 2019 AO. Rather, Mr. Longani wrote to the Board seeking reconsideration on July 22, 2021, long after Petitioner ended his campaign in September 2020. (Reisbaum Aff., Ex. F ("OATH R&R") (NYSCEF Doc. 36) at 4 n.1) The Board denied Mr. Longani's request as untimely. (Id.)
E. The DOI Investigation
In or about late August or early September 2019, the Board requested, pursuant to its authority under Charter § 2603(f), that the DOI investigate whether the NYPD was bearing any ancillary costs—e.g., airfare, rental cars, hotel accommodations, or meals—of Petitioner's and his immediate family's security details incurred during travel related to Petitioner's campaign for President. (See id., Ex. K ("OATH Hrg. Tr.") (NYSCEF Doc. 41) at 38:5-23; OATH R&R at 15; see also Pet. ¶ 71) That request was made in conjunction with a request that the DOI also investigate the separate matter of Petitioner's daughter's use of the NYPD in assisting her in an apartment move, as had been reported by the New York Daily News. (See OATH Hrg. Tr. 38:14-23) The DOI, however, had already opened an investigation into the matter involving Petitioner's daughter after the Daily News article was published and prior to the Board's referral. (See id. at 38:5-17) The two investigations were therefore combined into one, and that investigation was later, in or about October 2019, combined with an investigation into a separate third matter: whether Petitioner's son had improperly used his security detail for transportation to Yale University, where he was studying at the time. (Id. at 38:24-39:9; see also OATH R&R at 15) The DOI chose to investigate all three matters together, as part of one single investigation, because each matter involved the use of the NYPD security detail and would thus involve overlapping witnesses. (See OATH Hrg. Tr. at 39:10-22, 71:19-72:3; OATH R&R at 4)
The DOI first requested that the NYPD produce documents related to their officers' expenses incurred while providing security to Petitioner and his immediate family during Petitioner's campaign by letter dated September 19, 2019. (See OATH Hrg. Tr. at 42:1-10, 43:3-44:3) That letter also requested documents pertinent to the other aspects of the investigation. (See id. at 42:11-43:2) Shortly after service of the letter, the NYPD began producing documents responsive to the DOI's requests on a rolling basis, but documents responsive to the DOI's specific request concerning the security details' campaign-related travel and other ancillary costs would not be provided to the DOI until in or about mid-March 2020. (See id. at 45:12-48:18) This initial response contained hundreds of documents but, after review, was nevertheless determined by the DOI to be incomplete, missing documents relating to two trips by Petitioner's wife to South Carolina and Pennsylvania in September 2019. (See id. at 48:18-24, 51:8-16, 52:5-24, 54:12-19) Subsequently, the COVID-19 pandemic put a halt to further NYPD productions of documents responsive to the DOI's requests. (See id. at 49:17-50:17) After the pandemic had subsided, by email dated April 16, 2021, and then by letter dated May 6, 2021, the DOI followed up with the NYPD on the outstanding productions. (See id. at 52:5-54:19) On or about May 28, 2021, the NYPD produced the outstanding documents concerning Petitioner's wife's trips to South Carolina and Pennsylvania. (See id. at 55:13-16)
On or about May 11, 2020, the DOI sent a subpoena to Petitioner's campaign seeking, potentially among other things, documents relating to Petitioner's campaign trips outside of the [*11]City between May 1 and September 30, 2019, and any payments made by the campaign to the NYPD during that same period. (See id. at 89:3-90:25) On July 2 and October 12, 2020, an attorney for the campaign responded to the subpoena by providing the DOI "with a list of all of [Petitioner's] campaign trips, stat[ing] that [Petitioner's] campaign had not reimbursed or made any payments to [the] NYPD, and referr[ing] [the] DOI to public disclosure reports that the campaign filed with the Federal Elections Commission ("FEC")." (OATH R&R at 4; OATH Hrg. Tr. at 91:1-18, 106:6-107:21)
Additionally, during the DOI's investigation, its investigators interviewed a number of relevant individuals. The DOI characterized those individuals as falling into four categories: (1) all members of Petitioner's and his immediate family's NYPD security details, including their supervisors, numbering a total of between 15 and 20 individuals; (2) certain City Hall staffers who had interacted with the security details; (3) members of federal agencies (supposedly interviewed to determine best practices); and, finally, (4) Petitioner and his wife, Ms. Chirlane McCray. (OATH Hrg. Tr. at 56:2-57:23)
After numerous attempts by the DOI to schedule Petitioner's and Ms. McCray's interviews, their interviews were finally conducted on July 28 (Ms. McCray) and July 29, 2021 (Petitioner). (See id. at 58:1-64:2, 96:1-4; Aff. of Andrew G. Celli, Jr. in Supp. of Bill de Blasio's Opp'n to Resp'ts' Mot. to Dismiss, dated Dec. 15, 2024 ("Celli Dec. Aff.") (NYSCEF Doc. 44), Ex. A ("de Blasio Interview Tr."))
During his interview, Petitioner testified that he consulted with the Mr. Longani, the City's Corporation Counsel, or his campaign counsel on questions concerning the City's conflicts-of-interest laws. (See de Blasio Interview Tr. at 11:7-8, 66:21-67:7) He also testified that many conversations between his campaign attorney and Mr. Longani occurred. (Id. at 67:10-16) According to Petitioner, he received conflicting advice concerning his use of his NYPD security detail on campaign trips. Specifically, Petitioner recalled that Mr. Longani had reported having a "very clear" conversation with the Board's counsel and what Mr. Longani viewed "as absolutely contradictory or different" guidance. (Id. at 67:18-68:3) Petitioner also stated that, to his knowledge, there was "very different guidance" and "an unresolved issue." (Id. at 68:1-3) He stated that he did not receive what he "felt was a fully clear understanding," he still did "not have a 100% clear understanding," and it remained "an unresolved issue." (Id. at 70:14-17)
Petitioner further testified that while he was unsure whether he recognized the copy of the 2019 AO shown to him during the interview, he knew there was written guidance and had discussed it with the NYPD. (Id. at 75:24-76:4, 77-78) When Petitioner was asked if he was aware that the Board had advised Mr. Longani that the NYPD had to be reimbursed for the security detail's travel costs, Petitioner answered that it was his understanding that there was "more than one type of guidance provided" and it was "still an open question." (Id. at 76:15-22) He stated that he had received "multiple points of information from multiple agencies, plus a historic record, wherein different pieces were in conflict." (Id. at 77:9-15)
During Petitioner's interview, the issue of attorney-client privilege was raised concerning Petitioner's conversations with Mr. Longani. DOI Commissioner Margaret Garnett was present at and participated in the interview and stated that the privilege belonged to the City and that those communications could only be revealed to the public or a third party with the Corporation Counsel's consent. (Id. at 68:4-19) However, because the DOI was incorporated within the City's privilege, the contents of the communications could, according to Commissioner Garnett, be revealed during the interview. (Id.) After a short break, Petitioner's interview continued, and, despite Commissioner Garnett's explanation, Petitioner did not disclose any specific details of [*12]his communications with Mr. Longani.
In October 2021, the DOI issued a 47-page report summarizing the findings of its investigation. (Pet. ¶ 71; OATH R&R at 15; OATH Hrg. Tr. 67:13, 71:17-72:17) Based on the documents provided by the NYPD and Petitioner's campaign and on the interviews conducted by the DOI, the DOI concluded that Petitioner's NYPD security detail incurred $319,794.20 in campaign-related travel costs, including "airfare, car rentals, overnight accommodations, meals, and other incidentals," and that Petitioner's campaign had not repaid any portion of that amount to the NYPD or the City. (OATH R&R at 3, 6; OATH Hr. Tr. 101:14-102:7) Petitioner does not contest this amount, but he asserts that neither the City nor the NYPD has ever sent him or his campaign "an invoice, statement, or other accounting reflecting" the $319,794.20 or any portion thereof. (Pet. ¶ 73; OATH Hrg. Tr. at 22:21-23)
F. The OATH R&R
On April 22, 2022, pursuant to Charter § 2606(h)(1) and Board Rules § 2-02(a)(1), the Board sent Petitioner a Notice of Initial Determination of Probable Cause. (Reisbaum Aff., Ex. G (the "PC Notice") (NYSCEF Doc. 37)) The PC Notice informed Petitioner that "[t]he Board . . . has made an initial determination that, by using $319,794.20 in City funds to pay for the travel expenses incurred by [the security detail] accompanying you and your family on Campaign-related trips, you used a City resource for a non-City purpose in violation of City Charter § 2604(b)(2), pursuant to Board Rules § 1-13(b)." (Id. at 2) As required by Charter § 2606(h)(1) and Board Rules § 2-02(b)(1), the PC Notice also informed Petitioner of his "opportunity to respond to, explain, rebut, or provide information concerning the[] allegations within twenty (20) days of [the] service of" the PC Notice. (Id. at 3) Through counsel, Petitioner filed a response with the Board on July 13, 2022. (See id., Ex. H (NYSCEF Doc. 38))
On August 26, 2022, after Petitioner had left office, the Board filed a Petition against Petitioner with OATH, indicating that the Board had sustained its initial probable-cause determination despite Petitioner's response to the PC Notice. (Id., Ex. I (NYSCEF Doc. 39); see also Pet. ¶ 75) The Petition charged Petitioner with one violation of Charter § 2604(b)(2) and 31 violations (one for each out-of-City trip during Petitioner's campaign) of Board Rules § 1-13(b). (Reisbaum Aff., Ex. I at 3-4) The Board sought an order requiring Petitioner to reimburse the City for the $319,794,20 in campaign-related travel costs incurred by Petitioner's security detail and imposing a fine on Petitioner in the amount of $25,000.00 for each of the 31 alleged violations of Board Rules § 1-13(b). (Id. at 4)
On December 22, 2022, OATH held an evidentiary hearing remotely by videoconference before Administrative Law Judge ("ALJ") Kevin Casey. (See OATH Hrg. Tr.) The Board and Petitioner, both of whom were represented by counsel, each called two witnesses at the hearing: (a) the Board called Eleonora Rivkin and Juve Hippolyte, a Senior Inspector General and an Inspector General at the DOI, respectively (id. at 35:3-128:22); and (b) Petitioner called John Miller, former NYPD Deputy Commissioner for Intelligence and Counterterrorism, and Henry T. Berger, former Special Counsel to the Mayor (id. at 130:13-166:10; OATH R&R at 7-8). Ms. Rivkin and Ms. Hippolyte were both members of the DOI team that investigated Petitioner's and his family's use of their security details and testified about that investigation. (OATH Hrg. Tr. at 39:23-40:11, 87:4-7; OATH R&R at 4) Mr. Miller oversaw Petitioner's security detail at the NYPD and testified to issues concerning it. (OATH Hrg. Tr. at 131:21-132:2; OATH R&R at 7) Mr. Berger counseled Petitioner on New York conflict-of-interest issues while Petitioner was Mayor and at times consulted with the Board on Petitioner's behalf. (See OATH Hrg. Tr. at 151:8-152:11; OATH R&R at 7) Mr. Berger had also served as counsel to other political [*13]campaigns. (OATH Hrg. Tr. at 149:21-150:9; OATH R&R at 7) He testified about, among other things, the nature of his communications with the Board and his understanding of how the Board's prior advisory opinions related to political travel. (See OATH R&R at 7)
Neither Petitioner nor Mr. Longani testified at the hearing. (Id.) Prior to the hearing, however, Petitioner had sought an adjournment because Mr. Longani was out of town and unavailable to testify. (See OATH Hrg. Tr. at 166:17-167:8; OATH R&R at 8 n.2) ALJ Casey denied the request but offered to schedule a second hearing day to allow Mr. Longani to appear. (See OATH Hrg. Tr. at 166:17-167:8; OATH R&R at 8 n.2) Petitioner did not take ALJ Casey up on his offer, however, instead choosing to rest his case on December 22 without calling Mr. Longani. (OATH Hrg. Tr. at 166:11-16; OATH R&R at 8 n.2)
On May 4, 2023, ALJ Casey issued the OATH R&R. (See OATH R&R; Pet. ¶ 78) Initially, ALJ Casey found that the Board had proved its charges against Petitioner because his failure to reimburse the City for his security detail's campaign-related travel expenses: (a) "conflicted with his duty to prevent the misuse of City resources," which duty derived from his Charter-imposed responsibility for the "'effectiveness and integrity of city government operations'" (id. at 8 (quoting Charter § 8(a))); and (b) constituted the use of City resources for the non-City purpose of his presidential campaign (OATH R&R at 8-9). ALJ Casey observed that the Board had, via the 2019 AO, provided clear guidance to Petitioner as to whether his actions would violate Charter § 2604(b)(2) and Board Rules § 1-3(b), but Petitioner failed to follow it. (See id. at 9) ALJ Casey recommended that Petitioner be ordered to reimburse the City for Petitioner's security detail's $319,794.20 in campaign-related travel expenses and pay a fine in the total amount of $155,000. (Id. at 1, 24; Pet. ¶ 79)
In the course of making his recommendations, ALJ Casey rejected each of Petitioner's arguments for dismissal of the charges:
(1) He first rejected Petitioner's argument that the Board was required to engage in formal rulemaking to enforce the prohibition, on the ground that "the Board already has a rule prohibiting [Petitioner's] conduct," namely, Board Rules § 1-13(b). (Id. at 10) ALJ Casey found that, contrary to Petitioner's contention, the 2019 AO "was not creating a new rule of general applicability" but was instead "addressing the specific questions before [the Board]." (Id. at 11)
(2) ALJ Casey next rejected Petitioner's argument that the 2019 AO "ignores and essentially reverses" the 2009 AO. (Id. at 11-12) The 2019 AO did not ignore the 2009 AO, ALJ Casey found, because the 2019 AO directly recognized the existence of the 2009 AO and explained at length how it "addressed a limited and different issue." (Id. at 11) ALJ Casey found that the 2009 AO "does not create a blanket exception to the ban on using City resources for a non-City purpose" but is "limited to the use of City-owned vehicles," as further demonstrated by the 2012 AO's express acknowledgment that the 2009 AO was an exception to the flat ban on using City time or resources for political activities. (Id.)
Additionally, according to ALJ Casey, the 2019 AO did not reverse the 2009 AO, because the 2019 AO "responded to the specific questions presented and distinguished between the use of a car and personnel for local activities and the substantial additional travel costs associated with a presidential campaign." (Id. at 12) ALJ Casey pointed in support to the fact that the 2019 AO emphasized that the advice it was providing "addressed only one type of political travel—travel by the Mayor or members of his immediate family in connection with the Mayor's candidacy for non-City elective office." [*14](Id. (emphasis in original)) Moreover, ALJ Casey rejected the relevance or persuasiveness of the prior political campaigns of other individuals running for offices other than President of the United States and the hypothetical future campaigns on which Petitioner relied, finding that this case is instead "limited to the question of whether the travel costs incurred by NYPD for [Petitioner's] presidential campaign served a City purpose." (Id.) Like the 2019 AO, ALJ Casey observed that "a presidential campaign is fundamentally different in scope than a run for local office and . . . involves a significant expenditure of resources" and that, "unlike a campaign for local office, where it may be difficult to distinguish between the travel costs associated with City and non-City business, the travel costs of providing out-of-town security for a presidential campaign are readily identifiable." (Id.)
(3) ALJ Casey next rejected Petitioner's argument that the Board was "throwing out deference to decades of NYPD practice" and had "abandoned deference to NYPD security decisions." (Id. at 13) To the contrary, ALJ Casey held, the Board did not dispute the need for Petitioner's security detail or that the City should pay the security detail's salaries, nor did the Board interfere "with the NYPD's assessment of security threats or question[] NYPD's security expertise." (Id.) Rather, the Board merely "maintain[ed] that [Petitioner] should not expect the City to assume the substantial additional travel expenses caused by his presidential campaign." (Id.) ALJ Casey observed that the Board "is responsible for interpreting and enforcing the City's conflicts of interest laws," and that it "rationally distinguished between costs associated with local security needs and substantial out-of-state travel costs associated with a presidential campaign," consistent with "the Board's long-standing interest in limiting the extent to which public servants use City resources for political activity." (Id.) Citing state and federal case law concerning the deference afforded to agency decisions, ALJ Casey held that "the fact that reasonable people may interpret the Charter and Board's rules differently does not render the Board's analysis irrational or unreasonable." (Id. at 14) Finally, ALJ Casey held that it was "within the Board's authority" to reach the conclusions that it did in this case and that "[t]o hold otherwise would give respondent, rather than the Board, the sole power to decide that City resources can be expended for his presidential campaign." (Id.)
(4) Finally, ALJ Casey rejected Petitioner's argument that the Board "unreasonably and unjustifiably delayed the commencement of this action for three years, which [allegedly] created substantial prejudice, compromised his constitutional right to receive and rely on legal counsel, and deprived him of his right to due process prior to the ordering of any penalty." (Id. at 14-15 (internal quotation marks omitted)) ALJ Casey found that Petitioner failed to show that the Board was responsible for any delay in commencing the enforcement action and that, in any event, the Board "presented credible evidence that the DOI acted diligently" in conducting its investigation and "reasonably when it combined this investigation with two other similar investigations." (Id. at 15) ALJ Casey further found that, contrary to Petitioner's contention, the DOI's investigation was not "redundant because [Petitioner's] FEC filing showed that his campaign had not reimbursed NYPD." (Id.) Petitioner's "campaign filings did not show the travel expenses that NYPD incurred," and, thus, "[f]or that information," ALJ Casey concluded that "DOI needed documents from NYPD[,] and it needed to compare the information that it received from NYPD with the information provided by [Petitioner] and his campaign." [*15](Id.)
Petitioner contended that he could have waived the privilege protecting his communications with Mr. Longani from disclosure and presented such evidence as part of an advice-of-counsel defense if Petitioner had still been Mayor when the evidentiary hearing occurred, but ALJ Casey rejected that contention on multiple grounds. Initially, ALJ Casey concluded that the "central flaw in [Petitioner's] argument is that a public servant who uses City resources for a non-City purpose cannot blame that conduct on bad or inadequate advice from counsel." (Id.) ALJ Casey found that, based on Petitioner's interview with the DOI, Petitioner knew about the 2019 AO and that if he "had any doubt or uncertainty about the Board's advice, he could have done what any other City employee is expected to do—he could have asked the Board himself." (Id. at 16) "Deliberate indifference to the Board's response," ALJ Casey concluded, "is not a defense." (Id.) Aside from the substantive lack of merit of Petitioner's contention, ALJ Casey also found that Petitioner was not in fact prevented from raising an advice-of-attorney defense, because the DOI Commissioner present during Petitioner's DOI interview informed Petitioner that the New York City Law Department had permitted Petitioner to reveal his communications with Mr. Longani. (Id. at 16-17) It was Petitioner who chose not to reveal them. (Id.)
ALJ Casey also addressed and rejected Petitioner's arguments concerning why the relief that the Board sought—i.e., reimbursement to the City of the security detail's $319,794.20 in campaign-related travel costs and a penalty against Petitioner in the total amount of $775,000—should not be awarded:
(1) He first rejected Petitioner's argument that, under Charter § 2606(d), the Board could not impose a fine because no rule of the Board prohibited the charged conduct. (See id. at 18-19) To the contrary, ALJ Casey found, the 2019 AO specifically identified Board Rules § 1-13(b) as applying to prohibit Petitioner's conduct, and the 2019 AO's statement that "[t]he questions you have asked are ones of first impression for the Board, not clearly covered by any Board Rules or prior advisory opinions," was isolated and not reflective of the Board's analysis and conclusions in the remainder of the 2019 AO. (See id.) ALJ Casey concluded that, "[c]onsistent with section 2606(d) of the Charter, the Board fairly identified the specific rule that prohibited [Petitioner's] proposed conduct." (Id. at 19)
(2) ALJ Casey next rejected Petitioner's argument that he could not be fined because the Board failed to consult with the "head of the agency involved" or with the Mayor, as allegedly required under Charter § 2606(b). (See id. at 19-21) ALJ Casey concluded that Petitioner's position—effectively, that the Board "can never fine a former Mayor, Comptroller, or Borough President without consulting with them before they leave office"—was an illogical interpretation of the statutory text and not required under the law. (Id. at 19) According to ALJ Casey, "[t]he obvious design of the consultation requirement is to allow for input from the City official responsible for overseeing a public servant's work." (Id.) But, ALJ Casey observed, "[w]hen a Mayor, Comptroller, or Borough President violates the conflicts of interest laws, there is no higher-ranking person to consult." (Id.) These elected officials, ALJ Casey concluded, may, "[l]ike any other public servant," "submit comments to the Board before imposition of any penalty." (Id.)
(3) ALJ Casey next rejected Petitioner's argument that he could not be required to [*16]reimburse the City under Charter § 2606(b-1). (Id. at 21-22) Petitioner advanced an interpretation of that statute that only allowed the Board to seek reimbursement where a penalty was first imposed. (Id. at 21) But ALJ Casey rejected that interpretation as mistaken, and further held that even if Petitioner's interpretation were correct, a penalty had properly been imposed so reimbursement could be required as well. (See id. at 22)
(4) Finally, ALJ Casey rejected Petitioner's argument that he could not be held personally liable for repayment to the City. (Id. at 22-24) Initially, ALJ Casey concluded that the Board's statement in the 2019 AO that Petitioner's campaign committee must pay or reimburse the City for the costs of Petitioner's security detail's campaign-related travel "should not be construed as a waiver of [the Board's] authority to seek repayment of City resources." (Id. at 22-23) Rather, according to ALJ Casey, "[r]equiring repayment from one who benefits from the misuse of City resources for a non-City purpose is consistent with the statute and Board's precedents." (Id. at 23) Further, in rejecting Petitioner's argument that he first needed to be served with a bill for the costs before an enforcement action could be maintained, ALJ Casey concluded that that was not the case and that Petitioner "should be held to the same ethical standard as a school payroll secretary or DOC official who misuses City resources for a non-City purpose," referring to prior Board enforcement actions in unrelated cases. (Id.) Moreover, ALJ Casey concluded that the City's Campaign Finance Act was inapplicable and that the Federal Election Campaign Act did not preempt the Board's "ability to enforce violations of the City's conflicts of interest laws," relying for that latter point on the New York Court of Appeals's decision in Holtzman v. Oliensis, 91 NY2d 488, 494 (1998). (Id. at 23-24) "Even if federal campaign finance regulations do not require reporting or repayment of the travel expenses incurred by [Petitioner's] security detail," ALJ Casey held, "the Board has broad authority to seek repayment for 'the value of any gain or benefit obtained by the respondent as a result of a violation.'" (Id. at 24 (quoting Charter § 2606(b-1)))
Ultimately, although ALJ Casey determined that imposition of a penalty against Petitioner was authorized and appropriate, he disagreed that the maximum penalty of $25,000 for each of the 31 violations, or $775,000 total, was an appropriate amount. (See id. at 20-21) After reviewing penalties imposed in prior enforcement actions against high-level City officials and finding that they ranged between $1,000 to $7,500 per violation, ALJ Casey determined that, while a substantial penalty was indeed necessary, the appropriate amount of the penalty was $5,000 per violation, or $155,000 total. (Id.)
G. The COIB Order
On June 15, 2023, the Board issued the COIB Order fully adopting the OATH R&R's findings of fact and conclusions of law. (Pet., Ex. A (NYSCEF Doc. 1) at 1) The COIB Order also adopted the OATH R&R's recommendations as to the amount of the reimbursement to be required from and the fine to be imposed on Petitioner. (Id.)
The Board noted in the COIB Order that both parties had been reminded of their right, pursuant to Board Rules § 2-03(h), to submit a post-hearing comment on the OATH R&R but that neither party did so within the time allowed. (Id.)
The Board also included in the COIB Order several observations and conclusions of its own, independent of the OATH R&R but expressly without limiting its findings and conclusions:
The City's conflicts of interest law, codified in Chapter 68 of the City Charter, exists to "preserve the trust placed in the public servants of the city, to promote public confidence [*17]in government, to protect the integrity of government decision-making and to enhance government efficiency." Charter Section 2600. Charter Section 2604(b)(2), as implemented in Board Rules Section 1-13(b), forwards this critical purpose by prohibiting servants from using City resources for any non-City purpose. When a public servant uses City resources for private purposes, it erodes the public's trust and makes City government less efficient. For this reason, the Board has routinely enforced this prohibition, particularly where a public servant uses City resources for the non-City purpose of advancing a campaign for elective office or other political activity.
[Petitioner's] conduct plainly violates this prohibition. Although there is a City purpose in the City paying for an NYPD security detail for the City's Mayor, including the security detail's salary and overtime, there is no City purpose in paying for the extra expenses incurred by that NYPD security detail to travel at a distance from the City to accompany the Mayor or his family on trips for his campaign for President of the United States. The Board advised [Petitioner] to this effect prior to his campaign; [Petitioner] disregarded the Board's advice.
(Id. at 2 (footnote omitted)) The Board, relying in part on Holtzman, 91 NY2d 488, also concluded that Charter § 2606(b)'s consultation requirement was inapplicable because Petitioner "was an executive branch elected official." (Id. at 2-3)
The COIB Order ordered Petitioner to pay a fine of $155,000 and to pay the City $319,794.20 within 30 days. (Id. at 3)
H. The Petition
Petitioner immediately sought judicial review of the COIB Order, the OATH R&R, and the 2019 AO by filing the underlying Verified Petition and Notice of Petition in this proceeding on the same day as the COIB Order, June 15, 2023. (Pet.; Notice of Pet., dated June 15, 2023 (NYSCEF Doc. 2))
In the Verified Petition, Petitioner alleges two causes of action. The first cause of action, pursuant to 42 U.S.C. § 1983, alleges that the Board's efforts to require Petitioner to reimburse the City and pay a fine violate Petitioner's rights under the First and Fourteenth Amendments to the U.S. Constitution. (See Pet. ¶¶ 82-93) Specifically, Petitioner alleges that the Board's efforts, for which it is "relying on" the 2019 AO, are "undue burdens on Petitioner and his federal campaign" and "create an unequal burden between candidates who [are] independently wealthy, and those like [Petitioner]—a career public servant—who are not." (Id. ¶ 86) Petitioner further alleges that the Board, through its efforts, has allegedly "reversed decades of precedent and practice to the contrary." (Id.)
Petitioner next alleges that the Board's efforts to require Petitioner to reimburse the City do not, as required under controlling law, further a legitimate substantial or compelling state objective. (See id. ¶¶ 87-92) Indeed, Petitioner alleges that the Board's efforts, rather than furthering such an objective, "undermine[] core interests of the City of New York that [the Board] previously articulated: promoting the administration of the business of the City of New York and protecting its elected leader." (Id. ¶ 87) Enforcement of the City's ethics rules is not a compelling objective in these circumstances, Petitioner alleges, because "[t]here is no material difference in the ethics of using City funds to protect the Mayor during the day but refusing to spend City funds on the NYPD security detail's hotel room that evening." (Id. ¶ 92) Further, even if a compelling state objective existed, Petitioner alleges that the Board's efforts are not reasonably calculated to achieve it. For example, if the state objective in question is to "protect the public fisc"—which, according to Petitioner, is not the Board's mandate—then the Board's [*18]efforts do not achieve that objective, Petitioner alleges, because the reimbursement amount "is a small fraction of the total resources expended for the NYPD detail of New York City's Category 1 protectees annually" and thus "has no appreciable effect on the budget of the NYPD or the City of New York." (Id. ¶ 90)
Finally, according to Petitioner's allegations in the first cause of action, the Board's "efforts to require [Petitioner] to reimburse [the City] . . . , all in the absence of prior notice, a legally-enforceable rule, or any lawfully-enacted prior condition on his service as Mayor, are unlawful and constitute violations of Petitioner's rights under the First and Fourteenth Amendments." (Id. ¶ 93)
Petitioner's second cause of action, pursuant to CPLR Article 78, alleges that the 2009 AO, the OATH R&R, and the COIB Order are arbitrary and capricious, and should thus be vacated, for a number of reasons, each articulated under one of five subheadings presumably in an attempt to couch similar ideas:
(1) Petitioner first alleges that the 2019 AO, the OATH R&R, and the COIB Order are arbitrary and capricious because the 2009 AO and the 2019 AO are irreconcilable. (See id. ¶¶ 98-100) Petitioner alleges that the 2009 AO "found that affording the Mayor, a Category 1 elected official, and his family, a fulltime NYPD protective detail at the City's expense was lawful and consistent with the ethics provisions of the New York City Charter," because a protective detail "furthered the City's interests in the continuity of City business and protecting the safety of its chief executive and highest elected official, the Mayor." (Id. ¶ 98) But, Petitioner further alleges, the Board in the 2019 AO contradicts its prior reasoning, "arbitrarily refashion[ing] the City's interests in Mayoral safety": the Board's "new position was that the City's interest in protecting Category 1 elected officials was overruled by the need for the City to collect incidental travel expenses incurred by the NYPD for protective services the NYPD deemed necessary in its professional judgment and discretion." (Id. ¶ 99)
(2) Petitioner next alleges that 2019 AO, the OATH R&R, and the COIB Order are arbitrary and capricious because "there is no sound logic or reasoning distinguishing coverage of [the security detail's] incidental expenses by the City . . . from coverage by the city of NYPD salary and overtime" or "between incidental expenses incurred by the Mayor's out-of-state campaigning for President of the United States (covered under the 2009 [AO] but supposedly not covered under the [2019 AO]), out[-]of[-]state campaigning for some other purpose (covered under the 2009 [AO] and the [2019 AO]), or a personal vacation (covered under the 2009 [AO] and the [2019 AO]." (Id. ¶ 104-05) According to Petitioner, the 2009 AO stated that "it would not violate the New York City Charter's ethics rules for the City of New York to pay all expenses for the NYPD Mayoral protective detail that the NYPD deemed necessary, including transportation and security for official business, unofficial business, political events, and personal events, both inside and outside the City of New York." (Id. ¶ 102) The 2019 AO, by contrast, "reasoned that the City should pay all salary and overtime of the NYPD protective detail for the Mayor when [Petitioner] took out-of-state trips in connection with a non-City candidacy, but not the incidental expenses," which expenses "would supposedly be for the Mayor's personal benefit to such a degree as to overrule the City of New York's interest in keeping the Mayor safe." (Id. ¶ 103) Further, Petitioner alleges that the 2019 AO requires the Board "to make individualized determinations as to the purpose of a Mayor's political engagements, and whether such purpose was of benefit to the City of [*19]New York, the Mayor himself, or both to varying degrees," which analysis the 2009 AO allegedly correctly determined was impracticable. (Id. ¶ 106)
(3) Petitioner next alleges that the 2019 AO and the COIB Order are "arbitrary and capricious because the [Board's] determination as to who pays for what is based solely on the geography of the Mayor's location and type of political engagement," which is allegedly "contrary to the plain language of [Board Rules §] 1-13(b), under which the NYPD deploys personnel and resources for the same 'City purpose' in other locations, and which does not contemplate the possibility of reimbursement as a cure for an alleged violation." (Id. ¶ 113) Providing around-the-clock protection to a Category 1 elected official such as the Mayor is a City purpose, according to Petitioner, that the "City and the NYPD cannot achieve . . . unless the NYPD's protective detail accompanies the Category 1 elected official at all times." (Id. ¶¶ 110-11) Petitioner alleges that the 2019 AO undermines that purpose and is inconsistent with the language of Board Rules § 1-13(b), which, according to Petitioner, has not been applied in any other context "to prohibit NYPD protection to the Mayor or any other Category 1 official." (Id. ¶ 112)
(4) Petitioner next alleges that because the Board has offered "shifting views," embodied in the 2009 AO, the later 2019 AO, and the still later COIB Order, "as to who or what entity is responsible for paying" the security detail's campaign-related travel expenses, the Board has "evidence[ed] unsound reasoning and arbitrary and capricious decision-making." (Id. ¶¶ 117, 119) The Board's failure to "promulgate rules with clear guidance," Petitioner alleges, "deprived [Petitioner] of certain of his due process rights." (Id. ¶¶ 115, 119) Specifically, "by initiating enforcement action after [Petitioner] had already left office, [the Board] deprived him of timely notice and the ability to raise certain defenses only available to the sitting Mayor." (Id. ¶ 119 (emphasis in original)) Additionally, Petitioner alleges that because the 2019 AO identified Petitioner's campaign committee, rather than Petitioner himself, as the party responsible for reimbursing the City, Petitioner cannot be held personally liable for such reimbursement—and nor can the campaign committee because the Board did not name the committee as a party in this proceeding. (Id. ¶¶ 118, 121)
(5) Petitioner next alleges that the Board exceeded its jurisdiction when it advised, through the 2019 AO, that Petitioner's federal campaign committee should make the reimbursement payments. (Id. ¶¶ 122-25) Further, Petitioner alleges that "finding [Petitioner] in violation of the Charter for non-payment of a bill never directed to him or his campaign committee is manifestly arbitrary and capricious." (Id. ¶ 126). Moreover, Petitioner alleges that "[e]xacting a penalty of $155,000 for this case of first impression would be manifestly unjust and violate the rule of lenity." (Id. ¶ 127) Finally, Petitioner alleges that the 2019 AO "is not an enforceable rule and has no force of law," and that "[a]bsent formal rule-making and proper advance notice that a rule requires such reimbursement, none of which occurred here, the [Board] has no lawful power to order Petitioner or [his campaign] to reimburse the City for incidental expenses for the Mayor's NYPD protective detail, or to pay penalties." (Id. ¶ 128)
On November 17, 2023, the Board moved to dismiss the Petition pursuant to CPLR § 7804(f) and Rule 3211(a)(7). (Notice of Mot., dated Nov. 17, 2023 (NYSCEF Doc. 28); Mem. of Law in Supp. of Mot. to Dismiss, dated Nov. 17, 2023 ("Resp'ts' Mem.") (NYSCEF Doc. 29)) Petitioner filed opposition to the motion on December 15, 2023. (Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, dated Dec. 15, 2023 ("Pet'r's Mem.") (NYSCEF Doc. 43)) The Board [*20]filed its reply on January 19, 2024. (Reply Mem. of Law in Further Supp. of Mot. to Dismiss, dated Jan. 19, 2024 ("Reply Mem.") (NYSCEF Doc. 48)) The Court held oral argument on the motion virtually via Microsoft Teams on April 30, 2024.
The motion is now decided as follows.
II. Legal Standard
CPLR 3211(a)(7) provides that a court may dismiss a pleading for failure to state a cause of action. On a motion to dismiss brought pursuant to CPLR 3211(a)(7), a court "must accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." Goldman v. Metro. Life Ins. Co., 5 NY3d 561, 570-71 (2005) (internal quotation marks and citation omitted). When considering such a motion, however, a court need not accept as true "conclusory allegations of fact or law not supported by allegations of specific fact." Wilson v. Tully, 43 AD2d 229, 234 (1st Dep't 1998). Furthermore, "[i]n assessing the legal sufficiency of a claim, the Court may consider those facts alleged in the complaint, documents attached as an exhibit therefor or incorporated by reference . . . and documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference." Dragonetti Bros. Landscaping Nursey & Florist, Inc. v. Verizon NY, Inc., 71 Misc 3d 1214(A), at *2 (NY Sup. Ct. NY Cty. Apr. 28, 2021) (internal quotation marks and citation omitted), aff'd, 208 AD3d 1125 (1st Dep't 2022).
In the First Department, a defendant moving pursuant to CPLR 3211(a)(7) may rely on extrinsic evidence to challenge the pleading:
A CPLR 3211(a)(7) motion may be used by a defendant to test the facial sufficiency of a pleading in two different ways. On the one hand, the motion may be used to dispose of an action in which the plaintiff has not stated a claim cognizable at law. On the other hand, the motion may be used to dispose of an action in which the plaintiff identified a cognizable cause of action but failed to assert a material allegation necessary to support the cause of action. As to the latter, the Court of Appeals has made clear that a defendant can submit evidence in support of the motion attacking a well-pleaded cognizable claim.
Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc., 115 AD3d 128, 134 (1st Dep't 2014) (citing Guggenheimer v. Ginzburg, 43 NY2d 268 (1977); Rovello v. Orofino Realty Co., Inc., 40 NY2d 633 (1976)). "Where extrinsic evidence is used, [and the motion is not converted to one for summary judgment,] the standard of review under a CPLR 3211 motion is 'whether the proponent of the pleading has a cause of action, not whether he has stated one.'" Biondi v. Beekman Hill House Apartment Corp., 257 AD2d 76, 81 (1st Dep't 1999) (quoting Guggenheimer, 43 NY2d at 275), aff'd, 94 NY2d 659 (2000). "'[T]he allegations are not deemed true[, and] [t]he motion should be granted where the essential facts have been negated beyond substantial question by the affidavits and evidentiary matter submitted.'" Id. (quoting Blackgold Realty Corp. v. Milne, 119 AD2d 512, 513 (1st Dep't 1986), aff'd, 69 NY2d 719). "[I]f the defendant's evidence establishes that the plaintiff has no cause of action (i.e., that a well-pleaded cognizable claim is flatly rejected by the documentary evidence), dismissal would be appropriate." Basis Yield Alpha Fund (Master), 115 AD3d at 135.

III. Discussion [FN6]
A. Procedural Issues
At the outset, the Court must address certain issues that it has observed in the manner in which certain documents have been filed here. Petitioner has commenced this proceeding as a special proceeding pursuant to CPLR Article 78. The procedure for such proceedings, including the documents required, is governed by CPLR Article 4 and Article 78. Under both Articles, a petition is required—and it must be verified in the case of an Article 78 proceeding specifically. CPLR §§ 402, 7804(d). Both Articles contemplate that the petition may be accompanied by affidavits, and Article 78 contemplates that the verified petition may also be accompanied by "other written proof." David D. Siegel, New York Practice § 552 (6th ed. 2024) ("Unlike the complaint in an action, the petition in a special proceeding is usually accompanied by affidavits."). Article 4 does this through its provision addressing notices of petition, providing therein that a "notice of petition shall specify the time and place of the hearing on the petition and the supporting affidavits, if any, accompanying the petition." Id. § 403(a) (emphasis added). Article 78 states more directly that affidavits and other written proof, if any, must accompany the verified petition: "There shall be a verified petition, which may be accompanied by affidavits or other written proof." Id. § 7804(d).
Both Articles also require a notice of petition (or, alternatively, an order to show cause). Id. §§ 403(a), (d), 7804(c). But nowhere does either Article permit affidavits or other written proof to accompany the notice. And nowhere does either Article require or permit a memorandum of law. Although both Articles also authorize a court to "permit such other pleadings as are authorized in an action upon such terms as it may specify," id. §§ 402, 7804(d), a memorandum of law is not considered a "pleading." Nevertheless, in this Court's experience, parties routinely file memoranda of law in support of their petitions in special proceedings, and courts generally consider them in deciding the petitions. Indeed, the Court so-ordered a stipulation between the parties in this proceeding providing for Petitioner's filing of a memorandum of law in support of the Verified Petition. (NYSCEF Docs. 9, 13) That stipulation, however, makes no mention of supporting affidavits and documents.
This is all relevant because Petitioner has filed an affidavit annexed to which are a number of documents. (Aff. of Andrew G. Celli, Jr. in Supp. of Bill de Blasio's Verified Pet., dated Sept. 22, 2023 ("Celli Sept. Aff.") (NYSCEF Doc. 16); id. Exs. A-K (NYSCEF Docs. 17-27)) But the affidavit and annexed documents were not filed along with the Verified Petition or the Notice of Petition, which were filed simultaneously on June 15, 2023. (See Pet.; Notice of Pet., dated June 15, 2023) Instead, they were filed months later, on September 22, 2023, in association with and support of Petitioner's Memorandum of Law in Support of Petitioner's Article 78 Application ("Petitioner's Article 78 Brief"). (NYSCEF Doc. 15) Clearly, however, these documents are meant to support the Verified Petition, as permitted by Article 78. They should, therefore, have been filed with the Verified Petition.
Whether the Court considers the affidavit and documents, despite the technical deficiency in their filing, has real, practical consequences for the motion under consideration. Because the affidavits and documents "supply more detail than a pleading does, the presence of affidavits often reduces dependence on the pleadings." Siegel, New York Practice § 552. Thus, "[t]he sufficiency of a pleading in a special proceeding . . . should be measured by the supporting affidavits as well as by the pleading itself; the affidavits can be taken as filling any gaps otherwise discernible in the pleading." Id.
Respondents do not object in any way to the manner or timing of Petitioner's filing of the affidavit and documents. Not surprising, given that there is significant overlap in the documents annexed to the affidavit and the documents that Respondents rely on to support their motion. [*21]Common between the two are: (1) the 2009 AO (Celli Sept. Aff., Ex. I (NYSCEF Doc. 25); 2009 AO); (2) the 2012 AO (Celli Sept. Aff., Ex. J (NYSCEF Doc. 26); 2012 AO); (3) Mr. Longani's May 8, 2019 letter to the Board (Celli Sept. Aff., Ex. A (NYSCEF Doc. 17); Reisbaum Aff., Ex. C); (4) the 2019 AO (Celli Sept. Aff., Ex. B (NYSCEF Doc. 18); 2019 AO); (5) the transcript of the December 20, 2022 hearing before OATH (Celli Sept. Aff., Ex. F (NYSCEF Doc. 22); OATH Hrg. Tr.); (6) the OATH R&R (Celli Sept. Aff., Ex. G (NYSCEF Doc. 23); OATH R&R); and (7) the COIB Order (Celli Sept. Aff., Ex. G; COIB Order).[FN7]
 Because Respondents have not objected to the Court's consideration of the affidavit and documents, and the Court does not perceive any prejudice to Respondents in considering them, the Court overlooks the technical filing deficiency, pursuant to CPLR § 2001, and considers the affidavit and documents as if they were filed simultaneously with the Verified Petition and in support thereof.
Petitioner's Article 78 Brief is another matter. In determining the instant motion to dismiss, the Court typically would consider the Verified Petition and any supporting affidavits and other written proof, as well as the parties' memoranda of law and exhibits thereto filed in connection with the motion. This latter category does not include Petitioner's Article 78 Brief, which the Court would typically only consider after it denied the instant motion, in connection with deciding the petition. Petitioner is given an opportunity to present his legal arguments in opposition to Respondents' motion in an opposition memorandum of law, which Petitioner has in fact filed. (Pet'r's Mem.) The Court, therefore, only considers Petitioner's Article 78 Brief to a limited extent, if at all—specifically, if Respondents directly address an argument that is made in Petitioner's Article 78 Brief, then the Court may also address it herein.
B. Article 78
Power and policy—these concepts tend to lurk in the background of every Article 78 proceeding. Here, however, they are thrust toward the foreground. Petitioner, who was the elected head of the executive branch of City government, challenges the authority of a City agency, the Board, to interpret and enforce against Petitioner the statute that the Board was entrusted by City voters to implement and the administrative rules that it enacted to do so. Broadly speaking, Petitioner argues that the Board's interpretation of the relevant Charter conflict-of-interest provision and Board rule exceeds the Board's authority because it: (a) is inconsistent and irreconcilable with the Board's own prior interpretation and application of the same provision and rule; (b) is internally illogical and unsupported by the text of the rule; and (c) supersedes the NYPD's Charter-granted authority and discretion over the deployment of NYPD personnel and resources to provide security for Category 1 elected officials like Petitioner. Petitioner also argues that certain prerequisites to the Board's ability to enforce the prohibition at issue were not satisfied and that the Board lacked the requisite authority for its actions in certain other ways. The Board counters that accepting Petitioner's arguments would amount to a diminution of the Board's power to interpret and enforce the City's conflict-of-interest laws and a concomitant transfer of that power, at least in part, to Petitioner, who then, as ALJ Casey concluded in the OATH R&R, would wield "the sole power to decide that City resources can be expended for his presidential campaign." (OATH R&R at 14) Through the dispute in this proceeding, the powers of the Mayor, the NYPD, and the Board are thus in conflict.
Policy stands in the foreground of this proceeding as well. All parties hereto appear to [*22]agree that protecting a mayor from harm is an important City policy, one that applies wherever the mayor is located and no matter the activity in which he or she is engaged. Mayors (including Petitioner) generally defer to the NYPD's security decisions; however, a mayor can choose to decline security for any reason. The parties' dispute, therefore, raises the question: If a mayor is responsible for paying the travel costs of his NYPD security detail when he or she travels out of the City to campaign for political office, will that discourage the mayor from accepting the NYPD's security recommendations or from accepting security at all? If so, there are obvious policy implications.
The Court, however, does not concern itself with policymaking. Whether it would ultimately be better policy for the City to bear the travel costs of a mayor's security detail when he or she travels at a distance from the City to campaign for non-City office is beyond the Court's mandate to decide. This is because, in this Article 78 proceeding, the Court's review of Respondents' actions is limited to determining whether they were affected by an error of law or are arbitrary or capricious. CPLR § 7803(3); Kent v. Lefkowitz, 27 NY3d 499, 505 (2016); W. 58th St. Coalition, Inc. v. City of NY, 188 AD3d 1, 8 (1st Dep't 2020). Review of an agency's actions for arbitrariness or capriciousness "is deferential for it is not the role of the courts to weigh the desirability of any action or choose among alternatives." Save America's Clocks, Inc. v. City of NY, 33 NY3d 198, 207 (2019) (internal quotation marks omitted). "[E]ven if different conclusions could be reached as a result of conflicting evidence," a reviewing court may not substitute its own judgment for that of the agency making the determination. Partnership 92 LP v. N.Y.S. Div. of Hous. & Community Renewal, 46 AD3d 425, 429 (1st Dep't 2007). "[T]he courts cannot interfere unless there is no rational basis for the exercise of discretion" or "the action is without sound basis in reason . . . and taken without regard to the facts." Save America's Clocks, 33 NY3d at 207 (quoting Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester Cty., 34 NY2d 222, 231 (1974)).
Here, City voters delegated the relevant policy determination to the Board, to be made consistent with the Charter. By issuing the 2019 AO, prosecuting the underlying enforcement action against Petitioner, and adopting in full in the COIB Order the OATH R&R's findings of fact and conclusions of law and its recommendations, the Board made the policy choice, consistent with its view of the law. The Court's only task is to decide whether the Board's choice—irrespective of whether the Court would have made the same choice in the Board's place—is within the permissible bounds of the law. In other words, whether its choice is support by fact and reason and not otherwise prohibited by law. If its choice meets those criteria, the Board unquestionably possessed the power to make it. The Court's discussion below is guided by this well-established principle.
For the reasons that follow, the Court determines that none of the 2019 AO, the OATH R&R, or the COIB Order are so bereft of support in fact or reason as to be invalid as arbitrary and capricious. Nor, the Court determines, do any of the three violate any other provision of the Charter.
i. Respondents' Actions Did Not Conflict With Precedent
Among Petitioner's many challenges to Respondents' actions under Article 78, the Court first addresses Petitioner's contention that Respondents' actions conflict, in one or more ways, with the Board's precedent, as reflected in its prior advice in the 2009 AO, the 2012 AO, and its prior practice. ALJ Casey and the Board rejected these arguments, and the Court concludes that they acted reasonably and rationally in doing so.
1. The 2019 AO Is A Binding Advisory Opinion
As an initial matter, Petitioner appears to suggest, without outright making the argument, that the 2019 AO is something altogether different from an advisory opinion because it was issued confidentially. The Court rejects this notion.
The 2019 AO is a Board advisory opinion within the meaning of Charter § 2603(c). It has all the hallmarks of an advisory opinion: it was rendered at the request of a public servant; it offers the Board's interpretation and advice on the application of the Charter and Board Rules to the specific proposed conduct and factual scenario raised in the request; it includes a statement concerning the limitations of the scope of the advice; and it is signed by the Board chair on behalf of the entire Board.
The Board explained to ALJ Casey that 2019 AO was not issued publicly, as required by Charter § 2603(c)(3), because "public disclosure, even with redactions, would have disclosed [Petitioner's] identity." (OATH R&R at 11 n.3) This does not strike the Court as an unreasonable course of action. In any event, a reading of Charter § 2603(c)(3) that renders an advisory opinion issued by the Board not an advisory opinion unless and until it is released publicly is meritless. That subsection does not make public release a precondition to a Board opinion actually constituting an advisory opinion under Charter § 2603(c).
2. There Is No Conflict Between the 2009 AO and the 2019 AO
Next, Petitioner misreads the 2009 AO and misapprehends—or else misstates—the purpose, scope, and effect of the Board's advisory opinions. As to the 2009 AO, Petitioner attributes determinations to the Board that it never made and—ignoring an advisory opinion's limited applicability to the party who requested it and to the facts presented in the request—contends that the 2009 AO applies beyond its stated scope. Specifically, Petitioner claims that the 2009 AO "found that affording the Mayor, a Category 1 elected official, and his family, a fulltime NYPD protective detail at the City's expense was lawful and consistent with the ethics provisions of the New York City Charter" and that the 2009 AO stated that "it would not violate the . . . Charter's ethics rules for the City . . . to pay all expenses for the NYPD Mayoral protective detail that the NYPD deemed necessary, including transportation and security for official business, unofficial business, political events, and personal events, both inside and outside the City of New York." (Pet. ¶¶ 98, 102)
Neither of these statements is accurate. The 2009 AO does not opine broadly on whether providing a mayor and his family with a fulltime NYPD security detail at the City's expense is lawful and consistent with Chapter 68 or the Board Rules. Rather, the 2009 AO addresses only the more limited question of whether and under which circumstances elected City officials who have use of City-owned vehicles may use them and City personnel as drivers for purposes other than official business. Indeed, the 2009 AO opens by asking, simply, "[U]nder what circumstances may such cars and drivers be used for other than official business purposes?" (2009 AO at 1) The Board then specifically states that, "[i]n this opinion, we limit our guidance to those elected officials who currently have use of City-owned cars and, where applicable, City employees as drivers." (Id.) Review of the substance of the 2009 AO demonstrates that its analysis is limited as stated and that it answers only the question posed therein by the Board. Certainly, the 2009 AO is premised on the fact that a Category 1 elected official requires security at all times and is thus assigned a fulltime security detail that will accompany the official on the trips he or she takes by City-owned vehicle, either as or in addition to a driver. There would otherwise have been no need for the Board to create separate categories of officials in its analysis. But the 2009 AO never purports to render formal advice on the fundamental question of an NYPD security detail's compliance with the City's conflicts-of-interest laws or, critically, the [*23]many circumstances in which such a detail could be used in compliance with those laws without reimbursement to the City other than in connection with travel in a City-owned vehicle. As ALJ Casey found, the 2009 AO does not create a "blanket exception to the ban on using City resources for a non-City purpose," as articulated in the 2012 AO. (OATH R&R at 11) Petitioner's attempts to extend the 2009 AO to other circumstances is based on perceived implication alone, not on the actual text of the advisory opinion.
Nor does the 2009 AO determine that the City must pay all expenses for a Category 1 official's security detail in all circumstances. True, the 2009 AO concludes that, even for travel outside of the City, a Category 1 official may use a City-owned vehicle and accompanying security personnel for any reason without reimbursement. (2009 AO at 10-11) But that conclusion contains its own limitation: the travel must involve a City-owned vehicle. Context and reasoning further demonstrate the limitation. The relevant context is the 2009 AO's express focus on the use of City-owned vehicles and accompanying personnel. Given that context, the Board's conclusion can reasonably be interpreted as applying only to travel that one would expect to be accomplished by car—i.e., travel within driving distance, as that phrase is commonly understood. As for reasoning, one justification relied upon by the 2009 AO for not requiring a Category 1 official to reimburse the City for unofficial use of a City-owned vehicle is that such a requirement would be unfair "[s]ince officials in this category are subject to security determinations by the NYPD requiring them to use City vehicles to the maximum extent possible for all local transportation." (Id. at 10 (emphasis added)) The Board, therefore, clearly contemplated that City-owned vehicles would only be used by Category 1 elected officials locally.
The Board itself interpreted the 2009 AO in just this manner. In the 2019 AO, the Board wrote that the 2009 AO addressed "the kind of travel that could be accomplished by using a City vehicle, that is, presumably travel within driving distance of the City," but did not address "the use of City resources in connection with purely political travel at a distance from the City." (2019 AO at 2) The entity best suited to interpreting the meaning and scope of the 2009 AO is its author, the Board. Cf. Mantilla v. N.Y.C. Dep't of Hous. Pres. & Dev., 230 AD3d 1006, 1008 (1st Dep't 2024) ("[A court] must defer to the administrative agency's rational interpretation of its own regulations in its area of expertise."); Molinari v. Bloomberg, 596 F. Supp. 2d 546, 579 (E.D.NY 2009) ("The advisory opinions of the Board 'should be given considerable weight by the courts.'" (quoting Di Lucia v. Mandelker, 110 AD2d 260, 263 (1st Dep't 1985))), aff'd, 564 F.3d 587 (2d Cir. 2009). Here, the Board's interpretation of the 2009 AO does not exceed the bounds of reason or rationality. Indeed, the Board's interpretation strikes this Court, for the reasons just explained, as the correct one.
Petitioner's insistence before and during this proceeding that the 2009 AO speaks definitively on the relevant issue—i.e., who bears responsibility for paying the ancillary costs of a mayor's NYPD security detail incurred during out-of-state campaign trips—is perplexing. That position is not supported by the opinion's text, for the reasons just discussed, or by the Charter or its history. Even if the 2009 AO bore on the relevant issue by anything other than implication, the New York City Charter Revision Commission (the "Commission") expressly cautioned that, "[w]hile advisory opinions may be instructive and of some guidance to other public servants [i.e., other than the public servant who requested it], they may not be relied upon by such other public servants as permission to engage in any particular conduct and cannot constitute a defense to any action taken." (Charter Revision Report at 160) Thus, Petitioner could have, in accordance with the Charter, used the 2009 AO and whatever implications he may have gleaned [*24]from it to guide his actions. But if Petitioner desired an official, definitive answer from the Board and the legal protections that attend such an answer, it was incumbent upon Petitioner—just like any other public servant—to obtain an advisory opinion from the Board addressing the specific factual scenario in question. Otherwise, Petitioner ran the risk that his interpretation of the 2009 AO was faulty and that any actions he took in reliance thereupon could be found contrary to the requirements of the City's conflicts-of-interest laws. It appears that Petitioner or his counsel at least suspected that the 2009 AO did not sufficiently address the particular scenario in question, because Mr. Longani sought and received the Board's advice in the 2019 AO. Indeed, Mr. Longani appears in this regard to have only been following the Board's advice in the 2009 AO, where it advised that, "[t]o the extent that a particular situation does not fit clearly within [these] guidelines [set forth in the 2009 AO], public servants are urged to contact the Board for guidance." (2009 AO at 16) The Board subsequently agreed, in the 2019 AO, that Mr. Longani's questions had not been directly addressed by any of the Board's prior advisory opinions, finding only that the 2009 AO came the closest. Nevertheless, for reasons known only to him or his counsel, Petitioner chose to ignore the Board's advice in the 2019 AO.
In light of the foregoing, Petitioner's contention that the 2019 AO somehow ignores, contradicts, or overturns the 2009 AO can easily be put to rest. Initially, as ALJ Casey noted in the OATH R&R, the 2019 AO directly addresses, interprets, and distinguishes the 2009 AO, so any contention that the Board ignored the 2009 AO when it drafted the 2019 AO is meritless. (OATH R&R at 11)
Meritless, too, is the contention that the 2019 AO is irreconcilable with the 2009 AO. These opinions are, in fact, reconcilable on the grounds that the Board itself relied upon in the 2019 AO: they simply address two different, although somewhat related, topics. As discussed, the 2009 AO advises on an elected official's use of City-owned vehicles and accompanying personnel for local travel relating to unofficial business and whether the elected official must reimburse the City for such use of City resources. While the 2019 AO, by contrast, expressly limits its analysis to whether the City must be reimbursed for the costs incurred by Petitioner's security detail during "out-of-City political travel incident to the Mayor's pursuit of non-City elective office for himself." (2019 AO at 3) As the Board observed, travel costs for a Mayor's security detail during local political activity are essentially guaranteed to be significantly less than similar costs during a campaign for non-City office, especially one such as President of the United States. As the Board further observed, although distinguishing between costs related to official and unofficial business during local travel may be impracticable, that difficulty effectively disappears during purely political travel outside of the City. Significantly, the difficulty in distinguishing such costs during local travel was one of the primary reasons that the Board, in the 2009 AO, declined to require Category 1 elected officials to reimburse the City for the use of City-owned vehicles during unofficial business in or near the City. It stands to reason, as Respondents themselves argue, that if distinguishing between a Category 1 elected official's official and unofficial business during local travel was practicable, then the Board may have required reimbursement for the costs related to unofficial business.
While these distinctions refute the contention that any conflict exists between the 2009 AO and the 2019 AO, a key similarity between the two opinions reinforces the point. As mentioned above, in the 2009 AO, the Board recognized that a Category 1 elected official's "need for protection and security remains the same whether the official ventures forth to perform a personal rather than official task or to attend a private social function rather than a public event." (2009 AO at 9) Because of that ever-present need for security, the Board concluded that [*25]there could be "no effective restriction on these officials' 'personal' use of City cars and drivers," including with regard to their use for the officials' attendance at political events. (Id.) This inescapable conclusion formed the basis for the Board's exception of the use of City-owned vehicles and accompanying security personnel from the flat ban on the use of City time and resources for political activity articulated in the 2012 AO. The Board relied on the very same 24-7-365 security needs, which it reasoned applied equally to travel and attendance at political events near or far, when it concluded in the 2019 AO that the City could foot the bill for the salary and overtime costs of Petitioner's security detail incurred during his campaign travel. (2019 AO at 3) In doing so, the Board effectively extended the limited exception to the flat ban that it had recognized in the 2009 AO to include Petitioner's use of his security detail during out-of-City campaign-related travel. The critical differences between the two opinions remain the differences discussed above, namely, the ancillary costs associated with the two types of travel and an official's practical ability to account for them.
In summary, after the 2019 AO, two exceptions exist to the 2012 AO's flat ban on the use of City time and resources for political activity, with both founded in the same reasoning that Category 1 elected officials require fulltime security: (1) as recognized in the 2009 AO, the use of City-owned vehicles and accompanying personnel for unofficial business, including political activity, without reimbursement, during a Category 1 elected official's travel within driving distance of the City; and (2) as recognized in the 2019 AO, Petitioner's use of his security detail, without reimbursement for their salary or overtime, during out-of-City travel incident to Petitioner's campaign for non-City elective office.
ALJ Casey found the foregoing distinctions and similarities between the 2009 AO and the 2019 AO compelling when upholding the Board's charges in the OATH R&R. The Court, in turn, finds them to be, at the very least, rational. The 2019 AO, the OATH R&R, and the COIB Order are not arbitrary or capricious, then, because of any irreconcilability between the Board's advice in the 2019 AO and its prior advice in the 2009 AO.
3. There Is No Conflict With Respondents' Practice
Nor are the 2009 AO, the OATH R&R, or the COIB Order arbitrary and capricious because they conflict with Respondents' practice. Petitioner points to the vacation that he and his family took to Italy in 2014, arguing that neither the City nor the NYPD sought reimbursement for the security detail's travel costs for that trip and that the Board did not subsequently charge Petitioner with a violation of Charter § 2604(b)(2) and Board Rules § 1-13(b), as it did here. He also points, for the same reasons, to other alleged out-of-City, overnight trips that he took during his time in office for political purposes. Finally, Petitioner contends that this Court should accept as true, pursuant to CPLR 3211, Petitioner's allegations concerning previous Mayors' travel outside of the City to campaign for non-City elective office.
Initially, the Court need not accept as true Petitioner's allegations concerning previous Mayors' trips. Respondents rely on extrinsic evidence to support their motion, thus Petitioner's allegations in the Verified Petition are not deemed true and can be negated by the evidence submitted. Basis Yield Alpha Fund (Master), 115 AD3d at 135. Respondents submit both the transcript of the December 22, 2022 evidentiary hearing before OATH and the OATH R&R. Both demonstrate, as Respondents argue, that Petitioner did not introduce any argument or factual support before OATH concerning the previous Mayors' trips that Petitioner now seeks to rely upon. Therefore, because the Court's consideration is limited to evidence and arguments that Petitioner raised before OATH, Levine v. N.Y.S. Liquor Auth., 23 NY2d 863, 864 (1969); Peckham v. Calogero, 54 AD3d 27, 31 (1st Dep't 2008), aff'd, 12 NY3d 424 (2009); HLV [*26]Assocs. v. Aponte, 223 AD2d 362, 363 (1st Dep't 1996), Respondents have demonstrated that the Court cannot properly consider these previous Mayors' trips in determining whether the 2019 AO, the OATH R&R, and the COIB Order are valid.
The Court may also consider the OATH R&R in deciding the motion without turning to Respondents' submissions. The OATH R&R is unquestionably incorporated by reference into the Verified Petition because it is attached to the Verified Petition as an exhibit and repeatedly referenced throughout the Verified Petition. See Dragonetti Bros. Landscaping Nursey & Florist, Inc., 71 Misc 3d at *2. Additionally, Petitioner separately submitted the OATH R&R as a document attached to an affidavit in support of the Verified Petition. (Celli Sept. Aff., Ex. G) See Siegel, New York Practice § 552 ("The sufficiency of a pleading in a special proceeding . . . should be measured by the supporting affidavits as well as by the pleading itself.").
As for Petitioner's family trip to Italy, it bears no relevance to the issues in dispute here. The 2019 AO embodies the Board's advice concerning Petitioner's exclusively political travel incident to his campaign for President of the United States, and the OATH R&R and COIB Order upheld charges against Petitioner related to that conduct only. A personal vacation punctuated by official City business, as Petitioner alleges occurred in 2014, is an altogether different type of travel than addressed by the 2019 AO, the OATH R&R, and the COIB Order. The 2012 AO articulates an absolute ban on the use of City time and resources for political activity, not for mixed personal and official activity. Accordingly, the 2014 Italy trip cannot support a determination that the Board has now, in the 2019 AO and the COIB Order, taken a position so inconsistent as to be arbitrary and capricious.
As for the out-of-City, overnight political trips that Petitioner allegedly took while in office without a reimbursement request from the City or the NYPD and without charge from the Board, the Court does not find this argument persuasive. The factual allegations underlying the argument consist of a single paragraph in the Verified Petition:
During [Petitioner's] tenure, he also travelled outside the City, on overnight trips, for political purposes, including political fundraising, support for other candidates or the Democratic Party, and political meetings. NYPD provided a full-time NYPD protective detail to [Petitioner] on all of those occasions, and all of the expenses for this protective detail were borne by the City of New York. There was never a request from the NYPD or any other City agency otherwise.
(Pet. ¶ 46) Nowhere does this paragraph provide any specific details about the alleged trips, such as the "where," "when," and specific purpose of each. The Court is therefore not obligated to accept these allegations, which are not well-pleaded, as true. Wilson, 43 AD2d at 234. Missing from the allegations is another piece of critical information: whether the Board had knowledge of each of the unidentified trips. Without knowledge of conduct, the Board obviously cannot take exception to it.
Going outside of the pleading itself, the Court has reviewed Mr. Berger's testimony during the December 22, 2022 evidentiary hearing. During his testimony, Mr. Berger was questioned about five out-of-City trips that Petitioner took that were allegedly political in nature and on which Petitioner was accompanied by his security detail, without request for reimbursement or charge of a violation of the City's conflicts-of-interest laws: (1) a trip to Manchester, England in 2014 to "meet with some sort of lefty group" (OATH Hrg. Tr. at 159:14-160:12); (2) a trip to Wisconsin in 2015 at the invitation of "a political group," potentially a "state democratic party or an affiliated group" (id. at 160:13-161:3); (3) a trip to [*27]Iowa in 2016 to "promot[e] the [progressive] agenda and try[] to make it an issue in the Democratic presidential primaries" (id. at 161:4-162:1); (4) a trip to Philadelphia, Pennsylvania in 2016 to attend the Democratic National Convention (id. at 162:2-17); and (5) a trip to Berlin and Hamburg, Germany in 2017 for an unspecified "political" purpose (id.). Nowhere in his testimony does Mr. Berger provide any further explanation of the purpose of any of these five trips. There is no record support, therefore, for Petitioner's allegation that his out-of-City political trips were for political fundraising purposes or to support other political candidates—and only minimal support for the other allegations concerning the trips' purposes. Nor did Mr. Berger testify that he spoke to or alerted the Board about any of these trips, either before or after they occurred, or that he was personally aware that the Board knew about the trips through another source, such as the press. The lack of any real utility in Mr. Berger's testimony may explain why, in his opposition memoranda, Petitioner does not cite Mr. Berger's testimony to support the only instance in which Petitioner refers—in an entirely perfunctory manner—to these alleged trips. (See Pet'r's Mem. at 5)
In the OATH R&R, ALJ Casey addressed Petitioner's arguments relating to his Italy trip and his alleged out-of-City political trips. The Board had argued to ALJ Casey that "seeking broader support for policies may serve a City purpose and a Mayor can be reinvigorated by vacations, but a candidate's personal quest for the presidency does not serve a City purpose and 'a successful campaign would deprive the City of its duly elected leader.'" (OATH R&R at 13) ALJ Casey expressed skepticism of some of the Board's arguments, positing that the City might benefit more from "a Mayor's participation in a policy discussion at a campaign forum than would result from the Mayor's beach vacation" and from "having a former Mayor in the White House." (Id. at 14) Nevertheless, ALJ Casey concluded that "the fact that reasonable people may interpret the Charter and Board's rules differently does not render the Board's analysis irrational or unreasonable." (Id. (citations omitted))
ALJ Casey's conclusion is the correct one under the law and cuts to the heart of this matter. Petitioner's position is essentially that if traveling outside of the City to campaign for President of the United States is not a City purpose, then traveling outside of the City for other political reasons and for personal reasons surely must also not be City purposes. That is, indeed, one rational interpretation of Charter § 2604(b)(2) and Board Rules § 1-13(b). But the existence of one rational interpretation—the one that Petitioner happens to prefer—does not foreclose the existence of other rational interpretations. Since practically the advent of Article 78, the Court's job has not been to decide whether a challenger's interpretation of a statute or administrative rule is "better" than the agency's (or vice versa); rather, it has been to determine merely whether the agency's interpretation is based in reason. The Board's competing interpretation and application of Board Rules § 1-13(b)—that Petitioner's campaign for President of the United States did not serve a City purpose but that the other allegedly political travel in which Petitioner participated while in office and now attempts to rely upon may have served such a purpose—is also rational in light of the Board's explanation of its reasoning before ALJ Casey. Even if the Court were inclined to interpret and apply Board Rules § 1-13(b) to these facts differently than the Board did, that would not constitute a valid reason under the law to invalidate the Board's own interpretation and application. ALJ Casey recognized this fact, despite his own skepticism, and he was right to do so.
Thus, there are no grounds to find that the 2019 AO, the OATH R&R, and the COIB Order are arbitrary and capricious as contrary to Respondents' practice.
ii. Respondents' Distinction Between Salary/Overtime and Travel Expenses Is Rational
There is no dispute here that protecting a mayor is a City purpose. Respondents concede the point in their moving memoranda. (Resp'ts' Mem. at 12) Petitioner agrees and argues that Respondents' concession is determinative and requires resolution of this matter in Petitioner's favor. Petitioner's reasoning brings to the fore the issue upon which, in this Court's view, this dispute truly turns.
According to Petitioner, if protecting a mayor is, as Respondents concede, a City purpose and thus paying the salary and overtime of Petitioner's NYPD security detail furthers a City purpose, then paying the travel costs that allow the security detail to be physically present with the mayor must also be a City purpose. The NYPD cannot protect the mayor, after all, if they are not present in the same location. It is the distinction that the Board draws between salary and overtime, on the one hand, and ancillary but necessary travel expenses, on the other hand, that Petitioner argues is arbitrary and capricious. Nowhere, Petitioner contends, do Board Rules § 1-13(b) or the 2012 AO allow for such "line drawing" between the use of City time and City resources for a non-City purpose such as political activity.
As an initial matter, Petitioner's contention that the 2012 AO does not permit the Board's disparate treatment of City time and City resources vis-à-vis their use for political activity is belied by the 2009 AO and the 2012 AO itself. As the Court just discussed extensively, in the 2009 AO, the Board permitted the use of City-owned vehicles and accompanying NYPD personnel for unofficial business, including political activity, within driving distance of the City without reimbursement. Again, the justification relied upon by the Board was that Category 1 elected officials like the mayor required around-the-clock security in all circumstances and were provided City-owned vehicles and NYPD security details for that reason, thus there could be no effective restriction on the officials' use of either. The Board further explained that reimbursement for the use of the City vehicles was not required because it not only would be unfair (because Category 1 elected officials were strongly encouraged to follow the NYPD's security recommendations and make use of the vehicles for all local travel) but distinguishing between those parts of the officials' activities that were official and unofficial and then accounting and reimbursing the City pro rata for the unofficial use would be impracticable. Implicit in the Board's analysis was a distinction between City resources—the use of the City-owned vehicles—and City time—the use of the accompanying NYPD security personnel. The 2009 AO made no mention whatsoever of potential reimbursement for the use of the NYPD security personnel. Then, in the 2012 AO, the Board itself expressly recognized that the 2009 AO created a limited exception to the blanket prohibition against using City time and resources for political activity. Thus, the argument that the Board did not permit exceptions to its blanket prohibition that treated City time and City resources differently is unsupported.
The question remains, however, whether the Board had the authority to engage in the "line drawing" that it did in the 2009 AO and the 2019 AO. ALJ Casey held that the Board did, in fact, possess such authority as the entity empowered to interpret and enforce the City's conflicts-of-interest laws, and that "[t]o hold otherwise would give [Petitioner], rather than the Board, the sole power to decide that City resources can be expended for his presidential campaign." (OATH R&R at 13-14) The Court agrees.
First, a point of clarification. Board Rules § 1-13(b) concerns the use of City resources for a non-City purpose. Board Rules § 1-13(a), by contrast, concerns the use of City time "to pursue personal or private activities"—i.e., for a non-City purpose. This is the Board's own interpretation of these rules. (See 2009 AO at 3 ("In Board Rules section 1-13, the Board has specified certain conduct that constitutes a violation of [Charter] Section 2604(b)(2). That rule [*28]prohibits public servants from, among other things, performing personal and private activities on City time and using City letterhead, personnel, equipment, resources, or supplies for any non-City purpose."); 2012 AO at 2 ("Pursuant to [Charter § 2604(b)(2)], the Board has adopted Rules of the Board Sections 1-13(a) and (b), which prohibit the use of City time and City resources for any non-City purpose.")) So, when Petitioner argues that the text of Board Rules § 1-13(b) does not permit a distinction between the use of City time and City resources for political activity, Petitioner is correct. But he is correct only because Board Rules § 1-13(b) does not address the use of City time; Board Rules § 1-13(a) does.
Putting that misapprehension aside, there can be no doubt that the Board is empowered to interpret the Charter and its own Board Rules. And such interpretation must include determining when the Board Rules do and do not apply in particular circumstances, otherwise the Board's Charter-granted power would be greatly diminished. Petitioner has not come forward with any, let alone sufficient, legal basis upon which the Court could, or should, curtail the Board's power in such a manner. Indeed, the standards inherent in a court's review of an agency's actions under Article 78 are specifically meant to avoid a court encroaching on an agency's power in its area of expertise. See Mantilla, 230 AD3d at 1008.
Significantly, it is possible to read the 2009 AO and the 2019 AO as if the Board is not even treating City time and City resources differently. Pursuant to that reading, in either advisory opinion, the Board is not saying that Board Rules § 1-13(a) and (b) do not apply in the circumstances at issue. Rather, in the 2009 AO, the Board is saying that, in the circumstances at issue, the public official's conduct must be excepted from the prohibitions because (a) otherwise a public official whom the NYPD has determined requires around-the-clock protection regardless of location would not receive that protection and (b) requiring the public official to make distinctions between the official and unofficial nature of his or her travel would be asking him or her to do something unfair and impracticable. In the 2019 AO, the Board is saying the same thing with regard to (a) but not with regard to (b), because, in the circumstances at issue, Petitioner can readily identify the unofficial aspects of his travel, because all of it is political. Thus, in the circumstances considered by the Board in the 2019 AO, the exception to Board Rules § 1-13(b) is not justified. It is a subtle but significant distinction: Board Rules § 1-13(a) and (b) do in fact apply but the circumstances, for other compelling reasons, do or do not call for exceptions to their application. The Court does not find anything irrational about the Board's reasoning underlying its determination that the travel costs of the mayor's security detail should not be excepted from application of Board Rules § 1-13(b).
But even if the Court is incorrect in this characterization of the 2009 AO and the 2019 AO, the question that still remains is whether the Board's so-called line-drawing was arbitrary or capricious. After adopting ALJ Casey's finding of fact and conclusions of law in full, the Board explained in the COIB Order, expressly without limiting the OATH R&R, that while "there is a City purpose in the City paying for an NYPD security detail for the City's Mayor, including the security detail's salary and overtime, there is no City purpose in paying for the extra expenses incurred by that NYPD security detail to travel at a distance from the City to accompany the Mayor or his family on trips for his campaign for President of the United States." (COIB Order at 2) For the reasoning underlying this conclusion, the Court must turn to the OATH R&R, wherein ALJ Casey summarized the Board's argument before OATH. According to ALJ Casey, "[t]he Board's conclusion turned on three factors":
1) salaries and overtime for the NYPD security detail would generally be the same wherever the Mayor and the Mayor's immediate family were located; 2) additional costs [*29]to put security in place at a distance from the City (including airfare, hotels, rental cars) may require substantial public expenditure to support purely political activity; and 3) ordinarily, those additional costs would not be incurred for political travel within the City, but would be incurred as part of the Mayor's campaign for non-City elective office for himself.
(OATH R&R at 9 (internal quotation marks and citation omitted)) ALJ Casey would go on to accept the Board's arguments, writing:
The Board is responsible for interpreting and enforcing the City's conflicts of interest laws. In its 2019 advisory letter, the Board rationally distinguished between costs associated with local security needs and substantial out-of-state travel costs associated with a presidential campaign. The Board found that those additional costs were for a non-City purpose. That conclusion is consistent with the Board's long-standing interest in limiting the extent to which public servants use City resources for political activity.
. . . .
It is within the Board's authority to conclude that using City funds to pay out-of-state travel costs associated with a presidential campaign does not serve a City purpose and violates section 1-13 of the Board's rules. . . . To hold otherwise would give [Petitioner], rather than the Board, the sole power to decide that City resources can be expended for his presidential campaign.
(Id. at 13-14 (citing Golden v. Clark, 76 NY2d 618, 623 (1990); In re Hynes, COIB Case No. 2013-771 (Mar. 23, 2018), available at https://www1.nyc.gov/assets/coib/downloads/pdf4/enf-dis/2013-771.pdf; COIB v. Oberman, COIB Case No. 2013-609, OATH Index No. 1657/14 (Nov. 6, 2014), aff'd, 148 AD3d 598 (1st Dep't 2017)))
Even if the Court harbored misgivings about the policy implications of the Board's and ALJ Casey's conclusions, the Court must exercise caution not to second-guess them just to substitute the Court's own policy preferences. Here, applying the proper deference, the Court determines that the Board's and ALJ Casey's conclusions are not arbitrary or capricious. In sum and effect, the Board reasoned that the City paying the salary and overtime for Petitioner's security detail during out-of-state political travel furthered a City purpose because it constitutes protecting the mayor (which all parties agree is a City purpose) and the costs would have been incurred regardless of the mayor's location. By contrast, the Board reasoned that the security detail's travel costs incurred during the same trips do not further a City purpose because they would not have been incurred but for Petitioner's out-of-state travel in service of his own interests in seeking non-City elective office and, furthermore, are substantially more than any that Petitioner's security detail might have incurred if the travel was for local political activity. ALJ Casey found the Board's reasoning permissible. Similarly, the Court cannot say that the Board or ALJ Casey acted arbitrarily or capriciously or without authority to engage in such line-drawing under the Board Rules.
Petitioner's argument that the security detail's ancillary travel costs must also be considered as for a City purpose because they are necessary for the detail to carry out its City purpose of protecting the mayor certainly has a logical simplicity and appeal. But, in the end, it is still just another example of a difference of opinion as to how Board Rules § 1-13(a) and (b) should be interpreted and applied. That Petitioner's proffered interpretation could be a rational interpretation—indeed, the interpretation that may make the most sense—does not mean that the Board's and ALJ Casey's interpretation is invalid or, as Petitioner also argues, "unmoored" from the text of the rules. There is nothing in the language of Board Rules § 1-13(a) and (b) indicating [*30]that it would be improper for the Board, under the appropriate circumstances, to treat the City time involved as being used for a City purpose while treating the City resources involved as not being used for a City purpose. Always the issue will be whether the reasoning that the Board or OATH uses to justify doing so is based in fact and is rational. Here, the Board and ALJ Casey essentially adopted a "but for" test: The City time (the detail's salary and overtime) would be expended regardless of Petitioner's political activity, since protecting a mayor at all times and in all circumstances is a separate City purpose and policy. The City resources (the ancillary campaign-related travel costs), however, would not be expended "but for" Petitioner's political activity, a non-City purpose. The Court cannot conclude that this is an irrational method of determining whether Board Rules § 1-13(a) and (b) should or should not apply in the particular circumstances in question here.
The Court likewise rejects Petitioner's contention that the Board has created through its actions the same kind of unworkable analysis that it rejected in the 2009 AO. The 2019 AO, the OATH R&R, and the COIB Order all address one specific type of prospective conduct only: Petitioner's out-of-City travel to campaign for non-City elective office. Petitioner never disputed before OATH that each of the 31 trips that he took that are the subject of this proceeding were solely campaign trips, and he never alleges to the contrary in his Verified Petition. In other words, neither the Board nor ALJ Casey ever considered a scenario involving out-of-state travel during which both official and unofficial business occurred. Respondents nevertheless offer a response to Petitioner's hypothetical imagining official business being conducted on a plane trip to a campaign stop in Iowa. Respondents argue that, even in that scenario, a mayor's security detail's travel costs would not have been incurred but for the campaign travel, making them an expenditure for a non-City purpose, without any accounting burden, consistent with the Board's position concerning the actual travel costs in question in this proceeding. Again, the Court cannot conclude that this analysis is irrational.
Accordingly, Petitioner has failed to demonstrate that the 2019 AO, the OATH R&R, or the COIB Order are arbitrary and capricious because they engage in arbitrary and illogical line-drawing that conflicts with the text of the applicable Board Rules.
iii. Respondents' Actions Do Not Conflict With or Supersede the NYPD's Own Authority Under the Charter
Petitioner next makes a series of arguments that stem from his position that the NYPD's security decisions are part of its Charter-mandated function and thus beyond the Board's power to question. Specifically, Petitioner contends that the "Charter confers upon the NYPD the duty and responsibility to protect City officials from physical harm." (Pet'r's Mem. at 8). For that assertion, Petitioner relies upon Charter § 435(a), which provides, in relevant part, that the NYPD "shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders . . . ; protect the rights of persons and property, [and] guard the public health."
ALJ Casey rejected Petitioner's argument that the Board had somehow interfered "with the NYPD's assessment of security threats or questioned NYPD's security expertise." (OATH R&R at 13) Rather, ALJ Casey noted that the Board did not dispute the need for Petitioner's security detail or that the City should pay the security detail's salaries but, instead, merely "maintain[ed] that [Petitioner] should not expect the City to assume the substantial additional travel expenses caused by his presidential campaign." (Id.) The Court finds ALJ Casey's conclusions in the OATH R&R to be reasonable.
Petitioner's position that the NYPD's security decisions are unquestionable is not in [*31]dispute because the Board does not, in fact, question them. To the contrary, the Board expressly "takes no position whatsoever on how the NYPD protects the Mayor." (Resp'ts' Mem. at 12). The Court does not view, as Petitioner's argument suggests, that the Board's determination that the City's conflicts-of-interest laws require Petitioner to bear the ancillary travel costs of his security detail as questioning or interfering with the NYPD's security decisions. The NYPD remains free to evaluate any threats that an official like the mayor may face and assign that official security as it deems necessary. Nothing about the Board's interpretation of Board Rules § 1-13(b) here changes that fact.
While Petitioner argues that the Board's conclusions in this matter would effectively supersede the NYPD's authority under the Charter, the effect of Petitioner's argument would be the opposite: the Board's ability to interpret and enforce the City's conflicts-of-interest laws would be subordinated to the NYPD's security decisions. Nothing in Charter § 435(a)'s general grant of power to the NYPD suggests that the NYPD's powers and duties were meant to be exclusive or to supersede all other agencies' Charter-granted powers and duties in all circumstances. Indeed, expressly to the contrary, Charter § 435(c) provides that, "[e]xcept as specifically provided herein, nothing contained in this section shall be deemed to limit, restrict, divest, transfer or supersede the powers or the jurisdiction of any agency as defined in section eleven hundred fifty of the charter." No provision of Charter § 435 appears to specifically "limit, restrict, divest, transfer or supersede the powers or the jurisdiction" of any other City agency. Petitioner provides the Court with no caselaw in which Charter § 435 is otherwise interpreted. See Riccardi v. City of NY, 76 Misc 2d 629, 630-31 (NY Sup. Ct. NY Cty. 1973) ("The powers vested in the Police Department by City Charter chapter 18, section 435, subd. a are not exclusive with respect to the enforcement and the prevention of the violation of laws and ordinances in force in the city where the Charter itself or other legislation lawfully confers specific power to enforce such laws on other agencies of the city having regulatory functions."). Nevertheless, the Board, an "agency" within the meaning of Charter § 1150, clearly recognizes the importance of the NYPD's role in protecting a mayor. Hence its recognition in the 2009 AO and the 2019 AO of an exception to the Board Rules to allow the City to pay the salary and overtime of Petitioner's security detail. But the Board rationally determined that the security detail's ancillary travel costs exist only because of Petitioner's personal choice to serve his own interests in pursuing non-City office. The Board's determination, based on its reasoning, does not invade an exclusive province of the NYPD but merely constitutes an exercise of its own concurrent, Charter-granted power to interpret and enforce the City's conflicts-of-interest laws.
This leads directly to Petitioner's contention that it was not his own choice that led to the travel costs in question but the NYPD's choice to protect Petitioner as they saw fit. This contention is meritless. Again, it was not irrational for the Board and ALJ Casey to conclude that Petitioner's choice to campaign out-of-state for non-City elective office is the sine qua non for the security detail's travel costs, as opposed to its salary and overtime costs, which would have been incurred regardless of Petitioner's location. Petitioner's position essentially eliminates his own agency in the choices he made.
The same can also be said more generally because Petitioner's argument also ignores the fact that his own witness, Mr. Miller, testified during the OATH hearing that Petitioner could reject NYPD security altogether in order to pursue a personal endeavor. (See OATH Hrg. Tr. at 142:16-143:6) Petitioner did not dispute or attempt to correct or discredit Mr. Miller's testimony or allege here that he did not have the power, as Mayor, to reject NYPD protection or require alterations to it, albeit against the NYPD's recommendation. Thus, ultimately, the Board's [*32]interpretation and application of Board Rules § 1-13(b) present City mayors like Petitioner with a choice between alternatives: if they wish to run for non-City elective office, then (a) they or their campaign must pay the ancillary travel costs of their NYPD security detail during out-of-state campaign travel; (b) they must forego their NYPD security detail on out-of-state campaign travel or otherwise work with the NYPD to reduce costs to an acceptable level; (c) they must forego out-of-state campaign travel; or (d) they must resign to run for non-City office. Whether a mayor should, as a policy matter, face such choices is—once again—not the Court's question to decide here. All that matters in resolving this matter is that, for the reasons discussed above, the Board's reasoning for requiring City mayors to make such choices is not an arbitrary and capricious interpretation of the Charter or Board Rules § 1-13 (b).
Finally, Petitioner argues that his security detail's travel costs during out-of-state travel cannot be considered a campaign cost because they are costs of the NYPD's responsibility to protect the mayor. In the OATH R&R, ALJ Casey found that Petitioner and his campaign indirectly benefited from the City bearing the ancillary travel costs of his security detail because Petitioner's campaign was left with more money to spend elsewhere. (OATH R&R at 22) The Court cannot conclude that this is an irrational determination.[FN8]

iv. Respondents' Actions Were Otherwise Authorized
In addition to arguing that the 2019 AO, the OATH R&R, and the COIB Order are arbitrary and capricious for the reasons just discussed, Petitioner argues, in some form or another, that the Board's interpretation and enforcement of the City's conflicts-of-interest laws in this matter exceeded the Board's authority because: (a) the City's conflicts-of-interest laws do not apply to City mayors; (b) neither the City nor the NYPD ever sent Petitioner or his campaign a bill for the security detail's campaign-related travel costs; (c) the Board failed to first promulgate an administrative rule that articulated the specific prohibition being enforced; (d) the Board identified Petitioner's campaign as being responsible for reimbursing the City, and the Board has no jurisdiction over a federal campaign committee; and (e) the Board failed to satisfy Chapter 68's consultation requirement.
The Court rejects each of these arguments, for the reasons discussed below.
1. The Conflicts-of-Interest Laws Apply to City Mayors
Initially, to the extent that Petitioner claims that he, as Mayor, was not subject to Chapter 68 and the Board Rules, he is mistaken. There is no basis in the text of the Charter or in caselaw to conclude otherwise.
As Respondents correctly contend, both Charter § 2604(b)(2) and Board Rules § 1-13(b) expressly apply to a "public servant," which term is defined in Charter § 2601(19) as "all officials, officers and employees of the city, including members of community boards and members of advisory committees, except unpaid members of advisory committees shall not be public servants." The term "elected official" is separately defined as "a person holding office as mayor, comptroller, public advocate, borough president or member of the council." Charter § 2601(10). Certainly, "all officials," as used in the definition of "public servant," includes an [*33]"elected official." Petitioner concedes this point. (See Pet'r's Mem. at 14) Thus, as an official within the meaning of Chapter 68, and as "the chief executive officer of the city," Charter § 3, the mayor is clearly and indisputably a "public servant" subject to the provisions of Chapter 68. The Charter Revision Report only further confirms this interpretation of the plain text of § 2601(19), because it expressly states that the term "public servant" "includes "all elected officials." (Charter Revision Report at 153)
The general powers of the Mayor granted to him in Charter § 8 do not conflict with the mayor being subject to Chapter 68, and indeed § 8 specifically states that the Mayor's powers are "subject to this charter."
There is no merit, therefore, to Petitioner's remarkable contention that he is somehow not subject to the City's conflicts-of-interest laws.
2. An Agency Is Not Required to Bill an Official for His or Her Use of City Time or Resources In Violation of the City's Conflicts-of-Interest Laws
Petitioner's contention that the COIB Order is arbitrary and capricious because it seeks reimbursement of costs for which neither the City nor the NYPD ever sent a bill to Petitioner or to his campaign is also meritless. As ALJ Casey found, of course a City agency need not have sent a bill, invoice, or any other similar writing to a public servant subject to the City's conflict-of-interest laws before the Board may charge him or her with a violation of those laws and seek reimbursement for any improperly used City time or resources. Petitioner cites to no provision in the Charter or any other City or state law or to caselaw or Board precedent to support his contention. Nor does Petitioner provide any example in which the civil enforcement powers of a government agency, at either the local, state, or federal level, have been limited in such a manner. To the contrary, ALJ Casey found that the Board's precedent instead supports its actions here and that Petitioner should not be treated any differently or held to lesser ethical standards than the lower-level City employees involved in prior Board actions. (See OATH R&R at 23) That is not arbitrary or capricious.
Notwithstanding its complete lack of support in the law, Petitioner's contention also makes little sense within the scheme created by City voters in the Charter. It would require the City agency whose employee violated the conflict-of-interest laws to identify the violation, investigate it, and then effectively treat it as nothing more than a debt owed by the employee to the agency in the normal course. But that is not what the Charter envisions. The Board was created with the express purpose of implementing and enforcing the City's conflict-of-interest laws. See Rosenblum, 18 NY3d at 432 ("[A] major reason for the 1988 Charter revision [was] to create COIB as an entity with the power, which its predecessor Board of Ethics lacked, to commence administrative actions to enforce the Conflicts of Interest Law."). No other City agency was invested with those powers and responsibility.[FN9]
As part of its enforcement powers, [*34]the Board can direct the DOI to investigate suspected violations to determine their existence and extent, including monetary value. Once probable cause for a violation has been established, and the DOI or the Board has ascertained the value of the City time or resources involved, the Board does not then ask another City agency to bill the employee; rather, the Board charges the employee with a violation and commences an enforcement action.
Even more egregious, Petitioner's position, if accepted, would effectively divest him or any other official who violates the City's conflicts-of-interest laws of individual responsibility for their transgression. It was the official's conduct that resulted in the misuse of City time or resources. Petitioner seemingly suggests that if the transgressing official is not first told the value of their violation of law and asked to reimburse the City for it, he or she cannot be held accountable by the Board. That is nonsense.
Here, especially, Petitioner cannot reasonably object to the COIB Order. The Board expressly and specifically informed him, through the 2019 AO, which costs of his security detail the City could not lawfully bear. As ALJ Casey determined based on Petitioner's own testimony, which determination this Court finds reasonable, Petitioner knew or should have known of the Board's advice in the 2019 AO. (OATH R&R at 16) Yet Petitioner would have this Court endorse the idea that his failure to heed the Board's advice and account for the security detail's campaign-related travel costs is a bar to the Board's authority to seek reimbursement of those costs, the amount of which the Board was only able to determine after an extensive investigation by the DOI, including a subpoena to Petitioner's campaign. That position is meritless, and the Court will not endorse it by finding that the NYPD or the City was obligated to present Petitioner with a bill prior to the Board commencing the underlying enforcement action.
3. The Board Already Promulgated a Controlling Administrative Rule
Equally meritless is Petitioner's contention that the COIB Order is invalid because the Board did not first promulgate an administrative rule requiring reimbursement in the specific circumstances at issue here.
Petitioner's argument relies, at least in part, if not fully, on the premise that the OATH R&R and, by extension, the COIB Order are "predicated" on the 2019 AO—i.e., that the Board used the 2019 AO as a "sword" rather than its intended purpose as a "shield." That premise is entirely baseless, however. True, the Board's arguments in the OATH enforcement proceeding corresponded with the advice that the Board gave Petitioner in the 2019 AO. Also true, ALJ Casey accepted those arguments in rendering the OATH R&R and recommending that the Board's charges be sustained. But that does not make the OATH R&R "predicated" on the 2019 AO. All three—the Board's analysis in the 2019 AO, its arguments before OATH, and ALJ Casey's analysis in the OATH R&R—are instead expressly "predicated" on an interpretation and application of Board Rules § 1-13(b). It is unclear how the Board could, under Petitioner's view of law and procedure, ever maintain an enforcement proceeding where it had issued an advisory opinion to an official and the official then took action that failed to comply with the Board's advice. An advisory opinion by definition contains the Board's interpretation and application of [*35]the Charter and Board Rules to a specific factual scenario. Petitioner would seemingly bar the Board from making arguments in an enforcement proceeding reflecting its analysis in an advisory opinion, because, according to Petitioner, that would constitute wielding the advisory opinion as a "sword." That, too, is nonsense.
Both Petitioner and Respondents agree that an advisory opinion like the 2019 AO can only be used as a "shield[] that protect[s] public servants who proactively seek guidance from the Board." (Resp'ts' Mem. at 17) But Petitioner attempts to distort the meaning and scope of that protection in this matter in more ways than just the foregoing one. Petitioner also points to the following sentence in the 2019 AO and contends that he was entitled to rely on it "as a shield against the Board's later attempt to assert that such a rule does exist": "The questions [that Mr. Longani has] asked are ones of first impression for the Board, not clearly covered by any Board Rules or prior advisory opinions." (2019 AO at 2; Pet'r's Mem. at 12) This argument is also meritless.
Initially, accepting Petitioner's position requires ignoring every other sentence in the multipage 2019 AO. In the remainder of the 2019 AO—i.e., every part of it other than the one sentence on which Petitioner relies—the Board explains that Board Rule § 1-13(b) in fact applies to the Mr. Longani's questions and how. ALJ Casey reached the same conclusion in the OATH R&R, and he further concluded that the Board, pursuant to Charter § 2606(d), "fairly identified the specific rule that prohibited [Petitioner's] proposed conduct." (OATH R&R at 18-19) This is neither arbitrary nor capricious. Petitioner's attempt to focus on that single introductory sentence, while understandable, is nothing more than an attempt to shift the focus away from the actual analysis set forth in the 2019 AO.
The Board's analysis is, furthermore, consistent with its statement that Mr. Longani's questions are not "clearly covered by any Board Rules or prior advisory opinions." The operative word in that statement is "clearly." Board Rule § 1-13(b) does not clearly cover the campaign-related ancillary travel costs of a Mayor's security detail in the same way that it does not clearly cover many or all of the specific scenarios addressed in the 2012 AO, in the sense that the rule does not specifically say that X use of Y resources for Z purposes is or is not the use of City resources for a non-City purpose. The same is true of the 2009 AO. It would be difficult to argue that § 1-13(b) clearly covers a City official's use of City-owned vehicles and accompanying personnel in the sense that Petitioner appears to contend is necessary before the Board may enforce the rule. A prohibition against use of City resources for a non-City purpose is necessarily broad—it is, after all, a rule of general applicability—and as such can apply in many different circumstances. It thus requires interpretation and application. Although perhaps inartfully expressed, it appears that all the Board's statement in the 2019 AO meant to convey was that Mr. Longani's questions required the Board to interpret and apply its rules in ways that it had not yet had occasion to do.
Petitioner's position also misconstrues the nature of the safe harbor provided by an advisory opinion. The purpose of the Board's obligation (not just ability) under the Charter to issue advisory opinions is so that public servants can come to the Board and request its interpretation of how Chapter 68 and the Board Rules apply to the specific circumstances raised by the public servant. Upon receiving the advisory opinion, the public servant can then be assured that he or she will not face civil prosecution for violating the City's conflicts-of-interest laws if he or she acts in accordance with the Board's advice. Petitioner's position here is essentially that a single statement from an advisory opinion may be plucked from its surrounding context and relied upon to take action that is directly contrary to the advisory opinion's overall [*36]analysis and advice. Little additional comment is needed other than that Petitioner's position is clearly contrary to the Charter's intent.
Turning to Petitioner's claim that the 2019 AO created a rule of general applicability for which formal administrative rulemaking was required, ALJ Casey rejected this contention, finding that the 2019 AO instead applied preexisting Board Rules to a specific set of circumstances. Not only is ALJ Casey's analysis not arbitrary or capricious, but it is also correct. The Board did not create a new rule of general applicability via the 2019 AO; it merely applied an existing rule of general applicability, Board Rules § 1-13(b), to the specific circumstances raised by Mr. Longani's questions. Notably, the 2019 AO is no different than the 2009 AO in that regard. The 2009 AO was also an advisory opinion applying Board Rules § 1-13(b) to specific circumstances. Nowhere does Petitioner claim that the Board publicly identified the advice set forth in the 2009 AO as "establish[ing] a test, standard or criterion" and subsequently initiated rulemaking to adopt the 2009 AO as an administrative rule, as required under Charter § 2603(c)(4). Yet Petitioner relies heavily on the 2009 AO in this matter as if that opinion did establish a generally applicable rule. His conflicting positions on the two advisory opinions only further demonstrates the incorrectness of his position.
To the extent that Petitioner argues that Board Rules § 1-13(b) does not expressly permit the Board to require reimbursement in these circumstances, that contention is meritless for the additional reason that Charter § 2606(b-1) expressly authorizes the Board "to order payment to the [C]ity of the value of any gain or benefit obtained by the respondent as a result of the violation," subject to the hearing requirements set forth in Charter § 2603(h). The Court, therefore, cannot fault the Board for not spelling out its already clear authority to seek reimbursement from a public official who is found, after hearing, to have violated Chapter 68 in a separate, obviously superfluous rulemaking.
In conclusion, the 2019 AO specifically identified the already existing Board Rule that the Board was interpreting and applying to Mr. Longani's questions and did not separately create a new rule of general applicability requiring the Board to engage in formal administrative rulemaking procedure. ALJ Casey's conclusion to that effect in the OATH R&R, therefore, was not arbitrary or capricious.
This determination has the further effect of disposing of Petitioner's argument that the $155,000 penalty that the Board imposed on Petitioner was improper pursuant to Charter § 2606(d). The prohibited conduct—the use of City resources for a non-City purpose—was identified in Board Rules § 1-13(b). Petitioner's argument, taken to its natural end, would seemingly require the Board to promulgate administrative rules prohibiting all specific iterations of broader conduct prohibited by Board rule. Petitioner provides no legal support for that contention, and it nevertheless makes little sense as it would require the Board to foresee every single way in which a public servant could use City resources for a non-City purpose and codify a separate prohibition against each one. If a public servant engaged in conduct that violated the prohibition in an unpredicted way, the Board would, in Petitioner's view, be unable to enforce the Charter or its Board Rules. This cannot be the Charter's intent.
Moreover, because the Court finds that Petitioner's prohibited conduct was adequately specified by Board rule and that the 2019 AO unambiguously put him on notice of the prohibition, and additionally that the potential penalty for a violation of Chapter 68 was set forth in Charter § 2606(b), the rule of lenity does not apply here to bar the $155,000 penalty. Petitioner, in any event, does not make any effort in his opposition to defend that rule's application in these circumstances, whether on substantive grounds or by demonstrating that the [*37]rule applies outside of the criminal context. See People v. Badji, 36 NY3d 393, 404 (2021) (discussing rule of lenity's application to interpretation of ambiguous criminal statutes); People v. Green, 68 NY2d 151, 153 (1986) ("[I]f two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the rule of lenity." (internal quotation marks and citation omitted)). (See generally Pet'r's Mem.)
4. The Board's Identification of Petitioner's Campaign as an Entity that Could Pay the Security Detail's Travel Costs Does Not Invalidate Respondents' Actions
Petitioner next contends that Respondents' actions are invalid because the 2019 AO identified Petitioner's campaign as the entity that must pay Petitioner's security detail's ancillary travel costs. ALJ Casey rejected this argument in the OATH R&R, determining that the Board's statement in the 2019 AO "should not be construed as a waiver of [the Board's] authority to seek repayment of City resources" and that "[r]equiring repayment from one who benefits from the misuse of City resources for a non-City purpose is consistent with the statute and Board's precedents." (OATH R&R at 22-23) The Court concludes that ALJ Casey's determinations are not arbitrary or capricious.
Petitioner's argument again demonstrates his fundamental misapprehension of the purpose and effect of the Board's advisory opinions. Advisory opinions inform an inquiring public servant of the Board's interpretation and application of Chapter 68 and the Board Rules to the specific factual scenarios presented to it in the public servant's inquiry. If the inquiring public servant follows the Board's advice in the responsive opinion, he or she is shielded from penalty or sanction. Here, when the Board advised Mr. Longani—and, in effect, Petitioner—in the 2019 AO that Petitioner's security detail's travel costs "must be paid or reimbursed by the Mayor's campaign committee" (2019 AO at 5), the Board's advice came in the context of an analysis expressly constrained to whether the City could bear all costs associated with "out-of-City travel incident to the Mayor's pursuit of non-City elective office for himself." (Id. at 3) Contrary to Petitioner's assertion, the Board did not purport to exercise any jurisdiction over Petitioner's campaign—a jurisdiction that, as Petitioner correctly notes, the Board does not possess. But Petitioner's campaign committee is the vehicle through which he acts in relation to his seeking of elective office, and he controls it. It should, therefore, come as no surprise that the Board framed its advice as if Petitioner's campaign committee would be paying on his behalf the costs that the City could not properly bear. And if Petitioner's campaign committee had paid those costs, as the Board advised, then Petitioner could not have been found in violation of Board Rules § 1-13(b). That is the 2019 AO's only significance. To have interpreted the 2019 AO in any other way is simply unreasonable.
As ALJ Casey rationally determined, the 2019 AO did not constitute a waiver of the Board's ability to enforce Chapter 68 and the Board Rules against Petitioner, who bore ultimate responsibility for his use of his NYPD security detail in compliance with the City's conflicts-of-interest laws and benefited from its misuse. Petitioner, not his campaign committee, was subject to Chapter 68 and the Board Rules; the Board could thus never have maintained an enforcement action against the campaign if it failed to reimburse the City for Petitioner's security detail's travel costs. The Board advising in the 2019 AO that Petitioner's campaign committee could satisfy his obligations to the City under Chapter 68 on his behalf does not alter the fact that Petitioner is the party ultimately responsible for those obligations and subject to a Board enforcement action should he fail to meet them.
For these reasons, the Court also does not perceive any due-process concern created by the 2019 AO. As ALJ Casey determined, based on Petitioner's own testimony, Petitioner was [*38]aware or should have been aware of the Board's advice in the 2019 AO. In light of the proper interpretation of the 2019 AO, there is no plausible claim that Petitioner was not on notice that he could be subject to an enforcement action by the Board for a violation of Board Rules § 1-13(b) if he ignored the Board's advice.
5. The Board Did Not Fail to Satisfy Chapter 68's Consultation Requirement
Petitioner next contends that the penalty portion of the COIB Order is invalid because the Board failed to satisfy the consultation requirement contained in Charter §§ 2603(h)(3) and 2606(b). Section 2603(h)(3) provides, in relevant part, that if the Board determines that a violation of Chapter 68 has occurred, the Board
shall, after consultation with the head of the agency served or formerly served by the public servant, or in the case of an agency head, with the mayor, issue an order either imposing such penalties provided for by this [Chapter 68] as it deems appropriate, or recommending such penalties to the head of the agency served or formerly served by the public servant, or in the case of an agency head, to the mayor . . . .
Likewise, § 2606(b) conditions the Board's authority to issue fines of up to $25,000 per violation on satisfaction of the same consultation requirement. Petitioner contends that the Board did not consult with either him or his successor, Mayor Eric Adams, prior to imposing penalties against him, thus invalidating that portion of the COIB Order.
ALJ Casey rejected this argument, finding that "[t]he obvious design of the consultation requirement is to allow for input from the City official responsible for overseeing a public servant's work." (OATH R&R at 19) "When a Mayor, Comptroller, or Borough President violates the conflicts of interest laws," ALJ Casey observed, " there is no higher-ranking person to consult." (Id.) Instead, these elected officials may, "[l]ike any other public servant," "submit comments to the Board before imposition of a penalty." (Id.) Petitioner's contrary interpretation—effectively, that the Board "can never fine a former Mayor, Comptroller, or Borough President without consulting with them before they leave office"—was, according to ALJ Casey, an illogical interpretation of the statutory language and not required by law. (Id.)
Although it adopted the OATH R&R's conclusions of law in full, the Board also wrote separately on the question in the COIB Order. The Board concluded that "because [Petitioner] was an executive branch elected official, [the consultation] requirement does not apply here." (COIB Order at 2)
Initially, Petitioner's argument is not properly before the Court. Nowhere in the Verified Petition's first or second causes of action does Petitioner allege that the Board's failure to consult with him pursuant to Charter §§ 2603(h)(3) or 2606(b) constitutes grounds to invalidate the penalty imposed by the COIB Order. (See generally Pet. ¶¶ 82-128) See Gonzalez v. Annucci, 171 AD3d 1265, 1266 (3d Dep't 2019) ("[P]etitioner's claim that the Hearing Officer failed to address petitioner's asserted mental health issues was not raised in the verified petition and, as such, is not properly before this Court.") Indeed, the Verified Petition makes no reference to Charter §§ 2603(h)(3) or 2606(b), and Petitioner only alleges that the Board failed to consult with him or "any of his Deputy Mayors, or the City Corporation Counsel" while Petitioner was in office or with the current Mayor thereafter in the Verified Petition's Statement of Facts section. (Pet. ¶ 77) Although Petitioner subsequently raised the argument in Petitioner's Article 78 Brief (see NYSCEF Doc. 15 at 27-28), that is insufficient to properly put the issue before the Court. In an Article 78 proceeding, the verified petition sets forth the grounds upon which the petitioner seeks review and reversal of the agency action, and a supporting memorandum of law, if one is even filed (nowhere in CPLR Article 78 is one required), may only provide the legal [*39]support for those grounds. A memorandum of law may not introduce new alleged grounds for reversal not included in the verified petition.
To the extent that it can be said that Petitioner has properly raised the issue through his allegation in the Statement of Facts, that allegation alleges that the Board failed to consult Petitioner or "any of his Deputy Mayors, or the City Corporation Counsel . . . before levying its charges." (Pet. ¶ 77) Neither Charter §§ 2603(h)(3) nor 2606(b) require consultation with a respondent before the Board brings "charges" against a public servant.[FN10]
Rather, Charter §§ 2603(h)(3) and 2606(b) expressly require consultation only after hearing and before imposing any penalties.
Respondents, however, do not raise any argument in their motion based on these issues. They instead address Petitioner's non-consultation argument on substantive grounds. The Court will, therefore, do the same.
"[A]s a general rule, the practical construction of the statute by the agency charged with implementing it, if not unreasonable, is entitled to deference by the courts." Vill. of Scarsdale v. Jorling, 91 NY2d 507, 516 (1998) (internal quotation marks and citation omitted). "Deference is generally accorded to an administrative agency's interpretation of statutes it enforces when the interpretation involves some type of specialized knowledge." Belmonte v. Snashall, 2 NY3d 560, 565-66 (2004) (citation omitted). "By contrast, where the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency. . . . In such circumstances, the judiciary need not accord any deference to the agency's determination, and is free to ascertain the proper interpretation from the statutory language and legislative intent." Id. at 566 (internal quotation marks and citation omitted).
Here, the Board, which was created by the 1988 Charter Revision to interpret and enforce Chapter 68, has interpreted Charter §§ 2603(h)(3) and 2606(b) not to require consultation after hearing and before the imposition of a penalty against a public servant who, like Petitioner, is an executive branch elected official. To the extent that any consultation is required, the Board has also interpreted that requirement to be satisfied by the public servant's ability to participate in the enforcement proceeding and to submit comments on OATH's report and recommendation prior to issuance of the Board's order.
In the COIB Order, the Board cites two prior Board decisions in support of its interpretation of the Charter. In COIB v. Markowitz, COIB Case No. 2009-181, OATH Index No. 1400/11 (July 25, 2011), available at https://www.nyc.gov/assets/coib/downloads/pdf4/enf-dis/2009-181.pdf, the Board imposed a $20,000 fine against the then—Brooklyn Borough President Marty Markowitz for a violations of Charter § 2604(b)(3) resulting from his accepting of free travel and other accommodations for his wife to accompany him during international travel. Mr. Markowitz had requested that the Board consult with the Mayor, pursuant to Charter § 2603(h)(3), before imposing the penalty. The Board declined to do so, writing in its Final Findings of Fact, Conclusions of Law, and Order:
It is the view of the Board that the requirement of Charter Section 2603(h)(3) that the Board consult with the Mayor before imposing a penalty on an "agency head" was plainly not intended to include elected officials, such as Respondent, who are not [*40]appointed by, or responsible to, the Mayor. The clear purpose of the consultation requirement was to afford the City official directly responsible for overseeing a respondent's work, and with the power to retain or discharge the respondent, the opportunity to weigh-in [sic] on the appropriate penalty, before final Board action. Consultation with the Mayor would not serve that purpose where, as here, the Respondent is an elected official not subject to oversight or removal by the Mayor. In such a case, any requirement to consult is with the elected official himself or herself, a consultation afforded Respondent here in his opportunity to submit a comment to the Board on the Report. . . .
Id. at 4. Mr. Markowitz does not appear to have commenced an Article 78 proceeding challenging the Board's order.
The Board also relies on its prior decision in COIB v. Holtzman, COIB Case No. 93-121, OATH Index No. 581/94 (Apr. 3, 1996), available at https://www1.nyc.gov/assets/coib/downloads/pdf4/enf-dis/1993-121.pdf, wherein the Board fined then-Comptroller Elizabeth Holtzman $7,500 for violations of Charter § 2604(b)(3). In a footnote to its Decision and Order, the Board noted Charter § 2606(b)'s consultation requirement but concluded that, "[a]s the Respondent was an elected official, this requirement does not apply." Id. at 41 n.3. There is no indication from the Board's order, however, that Ms. Holtzman ever raised the consultation requirement in her arguments before OATH or the Board. Mr. Holtzman subsequently commenced an Article 78 proceeding challenging the Board's order, but the First Department, Holtzman v. Oliensis, 240 AD2d 254 (1st Dep't 1997), and the Court of Appeals, Holtzman v. Oliensis, 91 NY2d 488 (1998), both upheld it. Again, however, it does not appear that Ms. Holtzman ever challenged the Board's order on the grounds that the Board had failed to satisfy the consultation requirement of Charter §§ 2603(h)(3) and 2606(b), because neither the First Department nor the Court of Appeals ever discusses that requirement.
This Court, then, is seemingly the first to consider the validity of the Board's interpretation of the consultation requirement in Charter §§ 2603(h)(3) and 2606(b), insofar as it applies to elected officials.
To the extent that the Board has interpreted the consultation requirement not to apply to Petitioner because he was an executive branch elected official (i.e., the Mayor)—the only question actually before the Court—the Court determines that the Board's interpretation is not only reasonable but also correct. To decide questions of statutory interpretation, courts "turn first to the plain language of the statute as the best evidence of legislative intent." Malta Town Centre I, Ltd. v. Town of Malta Bd. of Assessment Review, 3 NY3d 563, 568 (2004); Belmonte, 2 NY3d at 566 (engaging in a "plain language reading" of the statute in question). It is the "accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided." Artibee v. Home Place Corp., 28 NY3d 739, 749 (2017) (internal quotation marks and citations omitted). At the same time, it is "a well-settled principle of statutory construction . . . [that] courts . . . will not blindly apply the words of a statute to arrive at an unreasonable or absurd result." People v. Santi, 3 NY3d 234, 242 (2004) (internal quotation marks and citations omitted); R.A. Bronson, Inc. v. Franklin Corr. Facility, 255 AD2d 723, 724 (3d Dep't 1998) ("It is axiomatic that in interpreting a statute, we should not do so in such a way as to reach an absurd result.").
The plain language of Charter §§ 2603(h)(3) and 2606(b) demonstrates that the consultation requirement does not apply to a mayor. Contrary to Petitioner's contention, it is not a question of whether a mayor qualifies as a "public servant" within the meaning of either [*41]section. As already determined herein, a mayor unquestionably is a "public servant" as that term is used throughout Chapter 68. The question, instead, is whether City voters and the Legislature intend for the mayor to be consulted when the mayor is the subject of the Board's proposed penalties. The provisions in question clearly envision consulting with an official ranking higher than the public servant subject to the proposed penalties: where the public servant subject to penalty is not an agency head, then the agency head is to be consulted; and where the public servant is an agency head, the mayor is to be consulted. The only way to read the relevant language of Charter §§ 2603(h)(3) and 2606(b), therefore, is that the intended purpose of the consultation requirement is to allow an official who oversees the work of a public servant subject to the Board's enforcement action to provide input on the Board's proposed or recommended penalties. No other agency official oversees the mayor's work.
The relevant language of Charter §§ 2603(h)(3) and 2606(b) must also be interpreted to mean that the mayor is not an "agency head" for purposes of the consultation requirement. The manner in which these two terms are juxtaposed in the language of the provisions—"in the case of an agency head, to the mayor"—suggests that one is not the other. This is significant because these provisions only contemplate consultation where the public servant is either a non—agency head or an agency head. Because the mayor is neither, based on a plain reading of the text of the relevant provisions, then the Board need not consult any other official when the mayor is the offender.
Requiring the Board to consult with the mayor concerning penalties to be levied against him, therefore, does not comport with the consultation requirement's purpose, is contrary to the plain text of the provisions in question, and is otherwise an absurd result that should be avoided.
To the extent that the language of Charter §§ 2603(h)(3) and 2606(b) can be said to be ambiguous, the Court's and the Board's interpretation of these provisions is consistent with the purpose of the consultation requirement as explained by the Commission. In the Charter Revision Report, the Commission wrote that the consultation requirement "recognizes that agencies have a strong interest in the disciplining of their officers and employees." (Charter Revision Report at 166) "While the board is not required to adopt the views expressed by the agency," the Commission wrote, "the agency head may raise issues or concerns the board will wish to consider in rendering a decision concerning the imposition of penalties." (Id.) Thus, Charter § 2603(h)(3) requires that the Board "consult with the head of the agency involved, [sic] (or if the public servant is an agency head, with the mayor), prior to imposing any penalties." (Id. at 165-66) Again the intent, as expressed by the Charter Revision Commission, appears to be to allow a higher-ranking agency official to provide nonbinding input to the Board on its proposed penalties against a lower-ranking agency official over whom the former has disciplinary power. There is no higher-ranking official to consult when the mayor is the subject of the Board's enforcement action. And, again, there appears to be a distinction between the mayor and agency heads, with the former being distinct from the latter, and an intent that consultation only be required when the offending public servant is an agency head or lower-ranking public servant.
Petitioner also contends that a failure to consult as required under Charter §§ 2603(h)(3) and 2606(b) raises due-process concerns. Even if mayors, and thus Petitioner, are subject to the consultation requirement, however, the Court does not perceive any due-process concerns arising from the Board's failure to comply. Clearly, the consultation requirement is not meant to protect the offending public servant; rather, as the Charter and the Charter Revision Report indicate, the requirement recognizes the agency's interest in the disciplining of its employees and the Board's interest in considering the agency's views when imposing penalties on the public servant. As [*42]Respondents point out, the consultation is an ex parte discussion, the results of which (either favorable to the public servant or not) need not be disclosed under any provision of Chapter 68. This also strongly indicates that the consultation requirement is not related to the due-process rights of the offending public servant.
More significantly, as Charter § 2603(h)(3) and (6) and the Charter Revision Report make clear, the Board is not required to adopt the consulted agency's views. Petitioner fails to explain how his due-process rights could be impaired by failing to consult with him (or the current mayor) when the Board can completely ignore his (or the current mayor's) views for any reason or no reason at all.
In any event, as the Court has determined, the consultation requirement of Charter §§ 2603(h)(3) and 2606(b) does not apply to Petitioner. Any complaints that Petitioner may otherwise have about the due process afforded him by the underlying proceedings are meritless. Petitioner was provided with notice of his alleged violations through service of a Notice of Initial Determination of Probable Cause and an opportunity to respond, which opportunity Petitioner took by filing an extensive response via the experienced and able counsel representing him herein. (PC Notice; Reisbaum Aff., Ex. H) Petitioner was then able to respond to the petition that the Board filed before OATH commencing the underlying enforcement action. Rules of Practice § 1-24, OATH, https://www.nyc.gov/site/oath/trials/chapter-i-subchapter-c.page (last visited Jan. 5, 2025). A hearing was subsequently held before an OATH ALJ, during which hearing Petitioner was again represented by experienced and able counsel and was able to, and did, present witnesses, documentary evidence, and argument and cross-examine the Board's witnesses. (See generally OATH Hrg. Tr.) The OATH ALJ then issued a comprehensive report and recommendation. (See generally OATH R&R) Significantly, Petitioner was then afforded the opportunity to submit a response to the OATH R&R within 30 days, pursuant to Board Rules § 2-03(h). (COIB Order at 1) Petitioner, for whatever reason, did not do so. (Id.) Given the many opportunities that Petitioner had to present his case, there is no reasonable grounds to find that he was not afforded due process of law here.
v. Respondents' Investigation Did Not Prejudice Petitioner
Petitioner contends finally that he suffered prejudice because of the delay in the Board bringing this matter to hearing. Specifically, Petitioner contends that he was deprived of an advice-of-counsel defense by the delay in this matter proceeding to hearing before OATH until after Petitioner's second, and last, term as Mayor ended.
ALJ Casey rejected Petitioner's arguments concerning both the delay and Petitioner's claimed advice-of-counsel defense. As to the delay, ALJ Casey found that Petitioner had failed to demonstrate that it was attributable to the Board's actions and not to the DOI's investigation, and that the evidence in any case demonstrated that the DOI acted diligently and properly. As to the advice-of-counsel defense, ALJ Casey found that, essentially, such a defense was not available to Petitioner, that Petitioner knew of the Board's advice in the 2019 AO and acted in deliberate indifference to it, and that, in any event, Petitioner was not prevented from raising such a defense before OATH.
For the reasons that follow, the Court finds that ALJ Casey, and thus the Board, did not act unreasonably in reaching these conclusions.
1. The DOI's Investigation Was Proper
As ALJ Casey found, the Board asked the DOI to investigate Petitioner's use of his security detail on campaign trips only a few months after he launched his campaign. (OATH R&R at 4) Indeed, the DOI launched its investigation contemporaneously with Petitioner ending [*43]his campaign after four months in or about late August or early September 2019. The DOI, upon receiving the Board's request, determined that it would be most efficient to investigate the matter in conjunction with other matters that had been brought to the DOI's attention involving the use of NYPD security details by Petitioner's immediate family. The DOI explained that combining the investigations into one made sense because each would involve interviewing overlapping witnesses. The DOI almost immediately requested that the NYPD provide it with documents concerning their officers' expenses incurred as a consequence of Petitioner's campaign trips. The NYPD would not produce responsive documents until months later, in mid-March 2020, and its production was determined by the DOI to be incomplete. At that point, the onset of the COVID-19 pandemic halted further NYPD cooperation with the DOI. After the pandemic subsided, the DOI followed up with the NYPD on outstanding requests, which were finally fulfilled on or about May 28, 201. The DOI also subpoenaed Petitioner's campaign for documents relating to Petitioner's campaign trips. Additionally, the DOI interviewed perhaps dozens of individuals, including, after multiple attempts to schedule their interviews, Petitioner and his wife in July 2021. The DOI then issued its 47-page report in October 2021, only three months after completing those interviews.
Nothing about how the DOI conducted the investigation into Petitioner's use of his security detail strikes this Court as unreasonable or improper, especially in light of the unavoidable delay engendered by the COVID-19 pandemic.
Petitioner's main criticism of the DOI's investigation is that it could have been avoided altogether if the DOI had simply relied on Petitioner's campaign's filings with the FEC. ALJ Casey rejected that argument, concluding that Petitioner's "campaign filings did not show the travel expenses that NYPD incurred," and, thus, "[f]or that information," ALJ Casey concluded that "DOI needed documents from NYPD[,] and it needed to compare the information that it received from NYPD with the information provided by [Petitioner] and his campaign." Petitioner does not allege or argue that the FEC filings included the NYPD's expenses information, only that they showed that the campaign had not made any payments or reimbursements to the NYPD. That information, however, only gets the Board and the DOI part of the way; they clearly needed information directly from the NYPD and Petitioner's campaign to determine the total number of campaign trips on which Petitioner or his immediate family were accompanied by an NYPD security detail and the NYPD's expenses incurred for providing protection on such trips. ALJ Casey's conclusion, therefore, was reasonable.
Indeed, even if the FEC filings had shown the security detail's travel-related expenses, this Court is not prepared to hold that it was unreasonable for the Board and the DOI to conduct their own investigation to verify the veracity of the filings based on firsthand NYPD and campaign documents.
2. Respondents Did Not Deprive Petitioner of an Advice-of-Counsel Defense
Petitioner has failed to demonstrate that he would have been entitled to an advice-of-counsel defense in these circumstances. Strikingly, in every submission that Petitioner has made here—his Verified Petition, his memorandum in support thereof, and his memorandum in opposition to the motion—Petitioner has not once supported his claim that he was entitled to an advice-of-counsel defense by reference to law. He has not presented the Court with any caselaw setting forth a standard for when an advice-of-counsel defense is available or showing—by, at the very least, analogy—that such a defense is available in the circumstances at issue in this matter. He instead simply makes the claim that he would have been entitled to such a defense and expects—or hopes—that the Court accepts it. But the Court is not inclined to do so without [*44]some basis in law and analysis particular to the circumstances in question put forward by Petitioner, the party claiming the availability of the defense.
Respondents, by contrast, claim that no such defense would have been available to Petitioner for a number of reasons. One speaks directly to the Court's concern. Respondents argue that Petitioner's alleged advice-of-counsel defense "would fail since the Charter does not countenance reliance on advice from a City employee that conflicts with [Board] guidance." (Reply Mem. at 12) To support their argument, Respondents rely on a number of Board orders, including COIB v. Capetanakis, COIB Case No. 99-157, OATH Index No. 604/01, 2001 WL 34036600 (July 16, 2001). In that proceeding, the respondent argued that his actions found to have violated the City's conflicts-of-interest laws were authorized by the Chairman of Community Board 10. Id. at 4. The Board rejected that defense, holding that "no community board chair or, indeed, any other public servant, except the Board, may authorize an action otherwise prohibited by conflicts of interest law." Id. In support of its holding, the Board cited to Charter § 2603(c), which authorizes and requires the Board to "render advisory opinions with respect to all matters covered by this chapter."
In the Court's view, Respondents' argument is correct. The Charter created an entity, the Board, specifically charged with interpreting and enforcing the City's conflicts-of-interest laws and, additionally, provided a mechanism by which public servants, like Petitioner, could directly request the Board's interpretation and application of those laws to particular contemplated actions. The advisory opinions that the Board is obligated to issue, furthermore, are binding to the extent that a public servant cannot be held liable for violating the City's conflicts-of-interest laws if he or she follows the Board's advice. In these unique circumstances, wherein any public servant can seek and receive binding advice on the meaning and application of the City's conflicts-of-interest laws from the very entity charged by the Charter to interpret and enforce those laws, and wherein Petitioner in fact sought and received such an opinion, an advice-of-counsel defense—which would simply assert that another attorney disagreed with the Board's advice—does not appear to be justified. This conclusion is especially appropriate here, based on Capetanakis, because the attorney who allegedly offered the contradictory advice was Mr. Longani, counsel to the Mayor and himself a public servant of the City—a public servant not charged with interpreting the City's conflicts-of-interest laws.
In the absence of any contradictory, on-point legal analysis from Petitioner, the Court is constrained to conclude that Respondents have demonstrated that no advice-of-counsel defense was legally available to Petitioner.
Petitioner's attempt to invoke an advice-of-counsel defense fails on an additional ground. Petitioner's argument that the delay in the underlying proceeding until he was no longer Mayor prevented him from asserting an advice-of-counsel defense presumes that he could have waived the attorney-client privilege protecting his communications with Mr. Longani from disclosure while he was still Mayor. It is axiomatic that the attorney-client privilege belongs to the client and can only be waived by him or her. CPLR § 4503(a); People v. Shapiro, 308 NY 453, 459 (1955). So, did the privilege belong to Petitioner when he was Mayor? Petitioner never specifically alleges that it did in his Verified Petition, and he never specifically argues that it did, with appropriate legal support, in any of his supporting papers in this matter. Just like his conclusory assertion that he was legally entitled to an advice-of-counsel defense here, Petitioner's right to waive any applicable privilege—one of the foundational premises of his argument—is completely unsupported. It is Petitioner's burden to demonstrate "the existence of circumstances justifying its recognition." Bloodgood v. Lynch, 293 N.Y.308, 314 (1944); In re [*45]Nassau Cty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003, 4 NY3d 665, 678 (2005).
In fact, the only documents in the record on this motion that even speak to who held the privilege, and thus who could have waived it, indicate that the privilege belonged to the City, not to the office of the Mayor. (de Blasio Interview Tr. at 68:4-16 (DOI Commissioner Garnett states, "So I just want to clarify for the record that the conversations between Mr. Longani and yourself, the privilege belongs to the City, and DOI is incorporated within that privilege. . . . We just can't disclose them to the public or any third party without the permission of corporation counsel. . . ."); OATH Hrg. Tr. at 125:3-16, 126:2-6 ("I can state that the . . . transcript says, that former commissioner says that . . . the privilege belongs to the city."), 128:7-11 ("[S]he stated that the privilege belonged to the city.")) Petitioner has not even attempted to demonstrate that, assuming the privilege belonged to the City, that his ability to waive the privilege was coextensive with the City's—i.e., that he was "the City" for purposes of holding and waiving the privilege.
Petitioner's counsel's communications with the New York City Law Department (the "Law Department") also do not provide any support for his position. In those communications, Petitioner's counsel requested confirmation that the Law Department's "position that a former mayor may not, as a now private citizen, waive attorney-client privilege to permit such testimony from his former Counsel to the Mayor," and the Law Department confirmed only "that former mayor may not waive attorney-client privilege in the circumstances you have described." (Celli Dec. Aff., Ex. B ("Law Dep't Email") (NYSCEF Doc. 46)) Nowhere does the Law Department confirm that Petitioner held the privilege when he was Mayor and could have waived it then—probably because that was not the question that Petitioner's counsel asked. Petitioner himself seems to allude to this fact, because he argues that "later communications with the [Law Department] all but confirmed . . . [that] the attorney-client privilege created by the Mayor's counsel's [sic] belonged to the sitting Mayor." (Pet'r's Mem. at 18 (emphasis added)) "All but confirmed" means, of course, that it was not expressly confirmed.
Even if an advice-of-counsel defense were legally available to Petitioner here, and even if Petitioner had demonstrated that he could have waived while he was still Mayor the privilege protecting his communications with Mr. Longani from disclosure, Petitioner's attempt to invoke an advice-of-counsel defense fails on yet another ground. The transcript of Petitioner's own interview with the DOI—a document that Petitioner himself submitted in opposition to the motion—demonstrates that he does not have a valid advice-of-counsel defense. As Respondents argue, Petitioner never testified that he received clear advice that his conduct contrary to the Board's advice in the 2019 AO was legal. Markowski v. S.E.C., 34 F.3d 99, 105 (2d Cir. 1994) (holding that invoke an advice-of-counsel defense, a party must, among other things, show that he "received advice that his conduct was legal"). Instead, as ALJ Casey found, he "repeatedly told interviewers that he had received conflicting advice" and that he "did 'not have a 100% clear understanding' of the Board's position." (OATH R&R at 5-6) Contrary to Petitioner's claim, his testimony that "I remember [Longani] reporting what he regarded as a very clear conversation with the counsel to the Conflicts of Interest Board. . . . [and] reporting what he viewed as absolutely contradictory or different" (de Blasio Interview Tr. at 67: 10-22) in no way shows that Petitioner received clear advice from Mr. Longani that Petitioner's proposed conduct would be legal.
Finally, Petitioner's counsel's communications with the Law Department show that he never actually requested that the City waive the attorney-client privilege as it applied to Petitioner's communications with Mr. Longani. (See generally Law Dep't Email) Petitioner [*46]cannot, therefore, demonstrate that he was actually prevented from presenting Mr. Longani as a witness at the OATH hearing.
3. Petitioner Has Failed to Demonstrate That Any Delay Prejudiced Him
Respondents contend that the Court of Appeals requires a court to evaluate the reasonableness of an administrative delay pursuant to four factors: "(1) the nature of the private interest allegedly compromised by the delay; (2) the actual prejudice to the private party; (3) the causal connection between the conduct of the parties and the delay; and (4) the underlying public policy advanced by governmental regulation." Cortlandt Nursing Home v. Axelrod, 66 NY2d 169, 178 (1985). Petitioner does not dispute that the analysis is conducted by weighing these four Cortlandt factors.
"Critical to an assessment of the reasonableness of administrative delay is whether the private party has incurred substantial prejudice by reason of the delay." Id. at 180. Petitioner alleges that the delay prejudiced him because he was unable to assert an advice-of-counsel defense. But, as the Court has just explained above, Petitioner fails to demonstrate that he was entitled to such a defense or that he was deprived of it by the Board's actions. The first and second factors weighs so heavily in Respondents' favor, therefore, that the Court's consideration of the other factors should not even be necessary.
Nevertheless, the third factor also ways heavily in Respondents' favor. As ALJ Casey found, Petitioner did not demonstrate that the Board was responsible for any delay in commencing the enforcement action. Indeed, the testimony adduced during the OATH hearing, which testimony Petitioner has submitted nothing to refute, demonstrates that the overwhelming majority of the delay in commencing the enforcement action was attributable to the DOI's investigation—which, again, was reasonable and proper. The Board received the DOI's report in October 2021, only approximately two months before Petitioner was to leave office. The Board then followed the procedures set forth in Chapter 68 and the Board Rules, designed to provide respondents like Petitioner due process. Petitioner cannot plausibly claim that the Board engaged in an unjustified and improper delay by following those procedures. And it is unreasonable to expect that the Board could have followed those procedures, commenced an enforcement action, and brought that enforcement action to a hearing before OATH—an aspect of this whole process that Petitioner has failed to demonstrate that the Board had any control over—within the two months in which Petitioner remained in office.
Accordingly, the Court concludes that ALJ Casey and the Board acted rationally and in line with the facts when they rejected Petitioner's claims concerning any delay and any prejudice resulting therefrom.
C. Section 1983
Petitioner argues that the failure of the City to pay the travel costs of his security detail in connection with his presidential campaign violates his First and Fourteenth Amendment Rights. Respondents, in turn, argue that Petitioner never raised his constitutional claims before OATH or the Board and thus they are unpreserved for review by this Court. Peckham, 12 NY3d at 430 ("As it is well settled that an argument may not be raised for the first time before the courts in an article 78 proceeding, this argument is not properly before us." (internal quotation marks and citation omitted)). Petitioner essentially concedes that these arguments were not raised below but contends that they could not have been raised then because they were not yet ripe. The Court is not convinced by Petitioner's argument.
According to Petitioner, his constitutional claims are "challenges to the [COIB] Order as applied." (Pet'r's Mem. at 20) As such, "these claims did not ripen until the administrative [*47]proceedings were complete, the Board had adopted the ALJ's finding, and the penalty became final binding." (Id.) Petitioner claims that he "was not constitutionally aggrieved until the Order was issued." (Id.) The only case that Petitioner relies on for the substantive proposition that he was not constitutionally aggrieved until the COIB Order was issued is Calvey v. Town Board of North Elba, No. 8:20-CV-711 (TJM/CFH), 2021 WL 1146283 (N.D.NY Mar. 25, 2021). The circumstances of that case, however, are distinguishable. There, the question was whether an as-applied takings claim was ripe for challenge in federal court. In reciting the applicable law, the district court noted that a "plaintiff is no longer required to exhaust state procedures for obtaining just compensation before bringing her takings claim to federal court," id. at *5 (quoting Martell v. City of St. Albans, 441 F. Supp. 3d 6, 21 (D. Vt. 2020)), but was instead required to show only "that a state regulatory agency . . . render[ed] a final decision on the matter before a takings claim can proceed," id. (quoting Sagaponack Realty, LLC v. Vill of Sagaponack, 778 F. App'x 63, 64 (2d Cir. 2020)). This case has nothing to do with whether Petitioner could have challenged the Board's proposed application of the Chapter 68 and the Board Rules to the facts of his case in the OATH proceeding, or whether failure to do so preserves those claims for review in this subsequent Article 78 proceeding. Petitioner has made no attempt to explain why the "specific ripeness requirements applicable to land use disputes" developed for and applied in the federal courts, Sunrise Detox V, LLC v. City of White Plains, 769 F.3d 118, 122 (2d Cir. 2014), should apply to his claims here. As Respondents point out, New York State courts regularly dismiss constitutional claims raised for the first time in Article 78 petitions. See Schulz v. Sate, 86 NY2d 225, 232 (1995) ("A constitutional claim that may require the resolution of factual issues reviewable at the administrative level should initially be addressed to the administrative agency . . . so that the necessary factual record can be established. . . . [M]erely asserting a constitutional violation will not excuse a litigant from first pursuing administrative remedies." (citations omitted)); Esperon v. Kelly, 125 AD3d 460, 460 (1st Dep't 2015) ("To the extent that petitioner frames his arguments as constitutional claims that his rights under the Second Amendment were violated, they are unpreserved; such arguments were not advanced at the agency level." (citation omitted)); Health Tea Corp. v. N.Y.C. Loft Bd., 162 AD2d 152, 153 (1st Dep't 1990) ("The landlord's constitutional argument was not raised before the administrative body, and is therefore not preserved for review by an article 78 court." (citation omitted)). Petitioner provides no countervailing caselaw that is not distinguishable.
The Court sees no reason why Petitioner could not have argued before OATH that the manner in which the Board was attempting to enforce Charter § 2604(b)(2) and Board Rules § 1-13(b) against him would constitute violations of his constitutional rights in the same manner that Petitioner now argues that they do. A claim that the Board was seeking to apply the Charter and Board Rules to Petitioner in an unconstitutional manner—i.e., an as-applied challenge—would seem to necessitate the building of a factual record just as Petitioner actually did during the OATH hearing. Schulz, 86 NY2d at 232. Indeed, the factual allegations underlying Petitioner's constitutional claims are the same facts that he elicited, or attempted to elicit, during the OATH hearing. Petitioner should have made these claims below, and because he did not, they are unpreserved for review.
Even if Petitioner's constitutional claims are preserved for review, they are meritless. Indeed, Petitioner barely defends those claims against Respondents' arguments for dismissal, spending all of a single paragraph in his memorandum of law addressing Respondents' extensive argument why they should be dismissed on the merits. (Pet'r's Mem. at 20-21) That paragraph, furthermore, makes perfunctory arguments only concerning the substantive validity of [*48]Petitioner's First Amendment claim; it makes no mention whatsoever of his Fourteenth Amendment claim. Thus, the Court concludes that Petitioner has, wisely, chosen not to defend that claim and only addresses the First Amendment claim.
Petitioner's single argument in opposition to dismissal of his First Amendment claim is that, contrary to Respondents' position, the COIB Order served no legitimate state interest "in ensuring government resources are not put towards non-government purposes," because Respondents concede that protecting the mayor is a legitimate government purpose. (Id. at 20) But that argument depends entirely on the invalidity of the Board's distinction between the salary and overtime of Petitioner's security detail serving the City purpose of protecting the mayor and its ancillary travel costs only serving Petitioner's personal interest in seeking non-City elective office. The Court has already decided that the Board's distinction, based on its proffered reasoning, is not arbitrary or capricious. Petitioner may not have asked the NYPD to provide him with the security detail during his campaign trips, but the Board unequivocally informed him prior to his campaign launch that the City's conflicts-of-interest laws required reimbursement of the security detail's travel expenses. This did not unduly burden Petitioner's First Amendment rights—he was still free to campaign; he simply had to pay for the ancillary travel costs of his security detail personally or through his campaign funds, or otherwise choose not to have the detail accompany him. As Respondents rightly argue, the Supreme Court has repeatedly "reject[ed] the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." Regan v. Tax'n With Representation of Wash., 461 U.S. 540, 546 (1983); Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 256 n.9 (1986) ("[T]here is no right to have speech subsidized by the Government.").
The Court has considered the additional contentions of the parties not specifically addressed herein. To the extent that any relief requested by the parties was not addressed by the Court, it is hereby denied.
Accordingly, it is hereby:
ORDERED that Respondents' motion to dismiss (Seq. No. 2) is GRANTED, and Petitioner's Notice of Petition (Seq. No. 1) is accordingly DENIED as moot; and it is further
ORDERED and ADJUDGED that Petitioner's Verified Petition is DENIED and DISMISSED; and it is further
ORDERED that Respondents shall serve a copy of this Decision and Order upon Petitioner and the Clerk of the General Clerk's Office with notice of entry within twenty (20) days thereof; and it is further
ORDERED that service upon the Clerk of Court shall be made in accordance with the procedures set forth in the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases (Revised August 15, 2019);[FN11]
and it is further
ORDERED that any requested relief not expressly addressed herein has been considered and is denied; and it is further
ORDERED that the Clerk shall mark Motion Sequences 1 and 2 decided in all court records; and it is further
ORDERED that the Clerk shall mark this proceeding disposed in all court records.
This constitutes the decision, order, and judgment of the Court.
DATE January 13, 2025
SHAHABUDDEEN A. ALLY, A.J.S.C.

Footnotes

Footnote 1:A "supervisory official" is defined as "any person having the authority to control or direct the work of a public servant." Charter § 2601(22).

Footnote 2:The 2009 AO specifies that, at the time of the opinion, there were only 15 such officials: the Mayor, the City Council Speaker and Minority Leader, the Public Advocate, the Comptroller, the Borough Presidents, and the District Attorneys. (2009 AO at 1-2) To safeguard those officials who are not provided security, however, the 2009 AO does not specifically identify which of these 15 elected officials use vehicles provided by the NYPD and which do not. (See id. at 2 n.1)

Footnote 3:Charter § 2604(b)(3) provides that "[n]o public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant."

Footnote 4:Board Rules § 1-13(a) provides that "it shall be a violation of City Charter § 2604(b)(2) for any public servant to pursue personal and private activities during times when the public servant is required to perform services for the City." 53 R.C.NY § 1.13(a).

Footnote 5:It is unclear whether this alleged Category 1 designation is or is meant to be equivalent to a Category 1 designation under the 2009 AO.

Footnote 6:When the Court uses any of the terms "public servant," "official," or "employee" in this Decision and Order, it means, in each instance, unless otherwise expressly stated, the full range of individuals subject to Chapter 68 pursuant to Charter § 2601(19).

Footnote 7:The Court also notes that both the OATH R&R and COIB Order are directly incorporated into the Verified Petition as Exhibit A thereto. (See Pet. at pp. 31-59)

Footnote 8:Petitioner's analogy of presidential candidates who visit the City receiving NYPD protection without bearing any of the costs of that protection is inapt. First of all, that candidate, not being a public servant of the City, would not be subject to the City's conflicts-of-interest laws. Second, that candidate would be in the City. The entire focus of this dispute is costs associated with out-of-state travel. The actions of the candidate in question would not have forced NYPD personnel to travel at a distance from the City, unlike Petitioner's actions here.

Footnote 9:This is not to say that another City agency should or need overlook a clear violation of the conflicts-of-interest laws and forego any internal discipline of the offending employee. It goes without saying that any agency should do so—and perhaps must, but that question is not currently before the Court. The Commission clearly contemplated that an agency would maintain concurrent jurisdiction with the Board to discipline its employees for violations of Chapter 68. (See Charter Revision Report at 166-67) But only the Board was expressly empowered to enforce Chapter 68 and to direct the DOI in doing so.
Still another circumstance that makes it clear that the Board bore the investigatory and enforcement responsibility in the instant matter is the fact that Petitioner was Mayor. As Mayor, Petitioner was the highest ranking executive official in the City. He oversaw City Hall and, through appointment of the Police Commissioner, the NYPD. To suggest that either would have sent Petitioner a bill seeking reimbursement for services rendered or otherwise would have attempted to discipline Petitioner—which they would not even have had the power to do—is unbelievable. That is the entire point of investing the Board with the power to enforce the City's conflict-of-interest laws.
Footnote 10:Chapter 68 does not use the term "charges," so Petitioner must be referring either to the service of a Notice of Initial Determination of Probable Cause, pursuant to Charter § 2603(h)(1), or the initiation of an enforcement action before OATH by petition, pursuant to § 2603(h)(2).

Footnote 11:The protocols are available at 
https://www.nycourts.gov/LegacyPDFS/courts/1jd/supctmanh/Efil-protocol.pdf.